935 F.2d 1428
 ST. PAUL FIRE AND MARINE INSURANCE COMPANY
v.
Barbara LEWIS, Nya Lewis, Khalid Lewis, John Mincy, Shahida
Mincy, Sheila M. Furey, Administratrix of the Estate of John
Charles Furey, Deceased, Delaware River Port Authority of
Pennsylvania and New Jersey, Andrew Klinghoffer.
Barbara Lewis, Nya Lewis, Khalid Lewis, Appellants in 90-1810,
John Mincy and Shahida Mincy, Appellants in 90-1821,
Delaware River Port Authority of Pennsylvania and New
Jersey, Appellants in 90-1822,
Sheila M. Furey, Administratrix of the Estate of John
Charles Furey, Deceased, Appellant in 90-1823.
 Nos. 90-1810, 90-1821 to 90-1823.
 United States Court of Appeals,
Third Circuit.
 Argued May 15, 1991.
Decided June 27, 1991.
Rehearing and Rehearing In Banc
Denied July 24, 1991.
 
 Martha J. Fessenden, Mesirov, Gelman, Jaffe, Cramer & Jamieson, Philadelphia, Pa., for appellant Nos. 90-1810/1821/1822/1823 Delaware River Port Authority of Pennsylvania and N.J.
 James C. Haggerty (argued), Cynthia E. Covie, Swartz, Campbell & Detweiler, Philadelphia, Pa., for appellee Nos. 90-1810/1821/1822/1823 St. Paul Fire and Marine Ins. Co.
 Lawrence A. Katz (argued), Coffey & Kaye, Bala Cynwyd, Pa., for appellant No. 90-1823 Sheila M. Furey.
 Ronald A. White, Philadelphia, Pa., for appellants No. 90-1810 Barbara Lewis, Nya Lewis and Khalid Lewis.
 Paul R. Sacks, Berkowitz & Leabman, Philadelphia, Pa., for appellants No. 90-1821 John and Shahida Mincy.
 Before HUTCHINSON, COWEN and GARTH, Circuit Judges.
 OPINION OF THE COURT
 COWEN, Circuit Judge.
 
 
 1
 This appeal arises from a declaratory judgment action in which St. Paul Fire and Marine Insurance Company ("St. Paul") seeks a determination that the adult son of its policy holder is not covered by an insurance policy it issued. The dispute turns on the meaning of the phrase "living with" in the insurance policy. We find the policy to be unambiguous, and hold it requires that a party have some regular, personal contacts with the insured's home in order to be covered by the policy. Because there is no evidence of any such contacts here, we will affirm the directed verdict entered in favor of St. Paul.
 
 I.
 
 2
 The incident giving rise to this insurance dispute occurred on October 16, 1983. That evening Andrew Klinghoffer was driving an automobile on the Benjamin Franklin Bridge, which spans the Delaware River between Philadelphia, Pennsylvania and Camden, New Jersey. Klinghoffer swerved out of his lane, crossed the center line, and collided with two cars travelling in the opposite direction. Those cars contained a total of six passengers, four of whom were injured and two of whom were killed in the accident. The injured parties and the estates of the deceased filed a tort action against Klinghoffer and the Delaware River Port Authority, which operates the Benjamin Franklin Bridge, in the Court of Common Pleas of Philadelphia County. That state tort action is still pending resolution.
 
 
 3
 At the time of the accident, Klinghoffer carried a personal automobile insurance policy with limits of coverage insufficient to meet the injured parties' claims against him. Klinghoffer's father, Leonard Klinghoffer, also carried a personal liability policy, referred to as an "excess" or "umbrella" policy, with St. Paul. That policy, which is the center of the controversy in this action, was in effect from February of 1983 through February of 1984 and had a coverage limit of $1,000,000.00. This umbrella policy provided "we'll cover all relatives living with you and anyone under 21 in your or their care. They're covered for any accidents involving an auto they own, rent or use as a temporary substitute." App. at 167 (emphasis added).
 
 
 4
 St. Paul initiated this declaratory judgment action pursuant to 28 U.S.C. Sec. 2201 (1988), under the district court's diversity jurisdiction, 28 U.S.C. Sec. 1332 (1991 Supp.), seeking a determination of whether Andrew Klinghoffer was entitled to coverage under his father's umbrella policy.[1] At trial, Klinghoffer testified that he was "living" in an apartment located at 4800 Pine Street in Philadelphia at the time of the accident. App. at 95-99, 126-27. It is uncontested that Klinghoffer and a roommate began leasing the two-bedroom Pine Street apartment in September of 1983. According to Klinghoffer's testimony, he slept and ate his meals at this apartment on a daily basis; kept personal belongings there, including his cat and fish; and received mail and telephone calls there.
 
 
 5
 The uncontradicted evidence also indicates that Klinghoffer maintained certain contacts with his parents' condominium located at 1820 Rittenhouse Square in Philadelphia. Specifically, Klinghoffer frequented his parents' condominium to visit, eat meals, and celebrate the holidays; he considered his parents' Rittenhouse Square condominium to be his "home," App. at 26; his parents maintained a separate room for him there, where he kept some personal belongings; he recorded his address as 1820 Rittenhouse Square on his drivers license, bank deposit slips, personal checks, 1982 and 1983 tax returns, job applications, and Federal Aviation Administration pilot's records; and he received mail at his parents' condominium. In addition, the emergency room records from the night of the accident, listed 1820 Rittenhouse Square as Klinghoffer's address. During the policy period, Klinghoffer's parents were also giving him some sporadic financial support of an unspecified amount.
 
 
 6
 After a two-day trial, the district court found that the only issue to be resolved was whether Klinghoffer was "living with" his father within the meaning of the St. Paul insurance policy. The court entered a directed verdict in favor of St. Paul, concluding that, under the law of Pennsylvania, the phrase "living with" in an insurance contract requires a person to physically reside with the insured and there was no evidence indicating that Klinghoffer satisfied that requirement. This consolidated appeal followed. We have jurisdiction under 28 U.S.C. Sec. 1291 (1988).[2]
 
 
 7
 Our review of the district court's granting of a directed verdict is plenary; we engage in the same inquiry as the district court in deciding the motion. Gay v. Petstock, 917 F.2d 768, 771 (3d Cir.1990). A directed verdict is appropriate only where the evidence, when viewed in a light most favorable to the party opposing the motion, is insufficient for a reasonable jury to find in favor of the opposing party. Id.
 
 II.
 
 8
 At issue in our review of this directed verdict is whether Klinghoffer was living with his father for purposes of coverage under his father's umbrella insurance policy. Resolution of this issue requires us to decide the meaning of the phrase "living with" in the insurance contract. We apply Pennsylvania law to this contract.[3] In construing an insurance policy, unambiguous terms are to be given their "plain and ordinary meaning." Pennsylvania Mfrs. Ass'n Ins. Co. v. Aetna Casualty & Sur. Ins. Co., 426 Pa. 453, 457, 233 A.2d 548, 551 (1967). Ambiguous terms, however, are to be construed strictly against the insurer, in favor of the insured. Mohn v. American Casualty Co of Reading, 458 Pa. 576, 586, 326 A.2d 346, 351 (1974). If the phrase living with is ambiguous, the defendants would automatically prevail under Pennsylvania law but if the phrase is not ambiguous, it must be given its plain meaning. Our initial inquiry, therefore, is whether the phrase is ambiguous.
 
 A.
 
 9
 Determining whether the terms of a contract are ambiguous is a question of law. See, e.g., International Union, UAW v. Mack Trucks, Inc., 917 F.2d 107, 111 (3d Cir.1990). We have recognized a contract ambiguity to be "intellectual uncertainty; ... the condition of admitting of two or more meanings, of being understood in more than one way, or referring to two or more things at the same time...." Id. (quoting Mellon Bank N.A. v. Aetna Business Credit, 619 F.2d 1001, 1011 (3d Cir.1980)). In determining whether a contract term is ambiguous, we must consider the actual words of the agreement themselves, as well as any alternative meanings offered by counsel, and extrinsic evidence offered in support of those alternative meanings. Id. In making the ambiguity determination, however, we must remember that "[t]he language of the policy may not be tortured ... to create ambiguities where none exist." Pacific Indem. Co. v. Linn, 766 F.2d 754, 761 (3d Cir.1985).
 
 
 10
 Applying these principles here, we find that the phrase living with in this insurance contract is not ambiguous. Moreover, we find that no reasonable jury could have found that the phrase does not require at least some regular, personal contacts with the insured's home. The verb "to live," in the sense of to live with someone in their home is defined as follows: "to occupy a home: dwell, reside" Webster's Third New International Dictionary 1323 (3d Ed.1986). The synonym "reside" is defined as "to settle oneself or thing in a place; to be stationed; remain; stay." Id. at 1931. These definitions indicate that the concept of living with someone contemplates, at a minimum, some consistent, personal contact with that person's home. Occasional, sporadic, and temporary contacts are insufficient.
 
 
 11
 Although Pennsylvania courts have not decided the meaning of the exact phrase at issue here, their consideration of a similar term leads us to predict that Pennsylvania courts would probably require some regular, personal contact in order for a party to be living with the insured for purposes of insurance coverage. In Amica Mut. Ins. Co. v. Donegal Mut. Ins. Co., 376 Pa.Super. 109, 545 A.2d 343 (1988), the Pennsylvania Superior Court held that the insured's daughter was not a resident of his household under his insurance contract, based on the trier of fact's findings that she made only sporadic visits to her father's house and did not live there. The court affirmed the trial court's finding that the daughter did not live with the insured and was not, therefore, a resident of his household for purposes of the insurance contract despite evidence indicating that she stayed overnight at her father's house three to five times a month, received mail there, and kept personal belongings there, which included a pet rabbit, one or two closets full of clothing, and approximately forty pairs of shoes. Id. at 113-14, 545 A.2d at 345.
 
 
 12
 Perhaps we would not have been able to conclude that this term is unambiguous if the defendants had offered an alternative definition that is plausible in the context of a parent and adult child. Instead of offering a concrete alternative definition of what would constitute living together in this context, however, the defendants merely assert that parties can live together without physically dwelling together. They rely on cases interpreting the phrase living with in the Social Security Act and workman's compensation statutes. See, e.g., Boyd v. Folsom, 257 F.2d 778 (3d Cir.1958) (widow of decedent wage earner was "living with" her husband at the time of his death for purposes of the Social Security Act, even though they maintained separate household, because he continued to make regular financial contributions to her support); Sheaffer v. Penn Dairies, 161 Pa.Super. 583, 56 A.2d 368 (1948) (decedent and his wife were living together for purposes of Pennsylvania workman's compensation statute even though they did not physically dwell together in same house, based on evidence that they saw each other daily and that there was no break in the connubial relations). The dissent's reliance on these cases to define this phrase in the insurance contract before us is misguided because they arise in a vastly different context. Whether or not two individuals live together as husband and wife focuses on factors that are completely irrelevant to determining whether other relatives live together. Moreover, Boyd focused on the financial support that the deceased had been giving his spouse because of the nature of the statutory compensation sought. Even if financial support were relevant to determining whether Klinghoffer was living with his father for purposes of insurance coverage, the only evidence of financial support is testimony that Klinghoffer's father occasionally gave him some money or bought him a suit. These sporadic payments are not the type of regular support contemplated in Boyd.
 
 
 13
 The defendants also refer us to cases holding that a member of the military may still be considered to live with his parents even if he does not actually reside in their home. See, e.g., United Services Auto Ass'n v. Evangelista, 698 F.Supp. 85 (E.D.Pa.1988) (individual on active duty in Air Force was still a member of his parents' household for purposes of insurance coverage, even though he was stationed elsewhere). We might find that a party need not have regular, personal contacts with a residency in order to be living there if he is prevented from having such contacts by virtue of a military assignment, or even by virtue of the fact that he was a full-time student. As this case does not present such a situation, we need not consider whether this contract would be ambiguous as applied to a member of the military, and find Evangelista to be inapplicable to the issue before us.
 
 
 14
 The defendants urge us to find that the St. Paul insurance contract is ambiguous because it does not restrict an individual from living in more than one place at a given time. The issue before us, however, is not whether Klinghoffer could live in more than one place. Rather, we must determine whether Klinghoffer's ties with his parents' condominium were such that he was actually living there, regardless of wherever else he might also have been living. We hold that the insurance contract unambiguously requires a party to maintain regular personal contacts with the insured's home, and as discussed below, we find that Klinghoffer did not meet these requirements. We need not, therefore, consider whether the term contemplates that a party can live at more than one place at a given time, and we will not rely on such a possibility to create an ambiguity. Pacific Indem. Co., 766 F.2d at 761.
 
 B.
 
 15
 Having determined this contract requires that a party have at least some regular, personal contacts with the insured's residency, we apply that determination to the facts before us. The evidence presented, even when viewed in a light most favorable to the defendants, contains no indication that Klinghoffer had the requisite contacts with his parents' condominium. The defendants have presented no evidence that his visits occurred with any frequency. The record indicates that he did not sleep at his parents' or take his meals there with any regularity.
 
 
 16
 The fact that Klinghoffer stored personal possessions at his parents' condominium and used their address for certain purposes does not replace personal contact. Klinghoffer could have rented a post office box or public storage facility to serve the same functions, but certainly would not have been considered to live at those places. As there is no evidence that could even create an inference that Klinghoffer had regular, personal contacts with his parents' home, we find that a directed verdict was appropriately entered in favor of St. Paul.
 
 C.
 
 17
 As a final matter, we address the defendants' argument that the question of whether Klinghoffer was covered by his father's umbrella insurance policy should have been decided by the jury because, even if he was not living with his parents at the time of the accident, there is evidence that could be interpreted as showing that he was living with them at other points during the policy period. Specifically, the defendants point to Klinghoffer's testimony that he could not remember where he lived during the summer of 1983, Klinghoffer's father's testimony that he believes his son stayed at the Rittenhouse Square condominium that summer, and the fact that Klinghoffer convalesced at his parents' condominium for some period after the accident before returning to his own apartment.
 
 
 18
 While it is true that the insurance policy does not explicitly state that a party must live with the insured at the time of the accident, we cannot interpret it to mean otherwise. The defendants' proposed interpretation would lead to an unreasonable result. If we were to interpret it as meaning that a party need only live with the insured at some point during the policy period, we would give insureds the ability to affect the scope of their policies after an accident occurred. Policy holders would be able to expand the scope of their coverage merely by having their adult children stay with them for a few days after an incident. We decline to adopt an interpretation that would lead to an such unreasonable result which could not have been intended by either Leonard Klinghoffer or St. Paul. See Tennant v. Hartford Steam Boiler Inspection & Ins. Co., 351 Pa. 102, 40 A.2d 385, 387 (1944) ("A contract of insurance must have a reasonable interpretation such as was probably in the contemplation of the parties when it was made.").
 
 III.
 
 19
 Because we find that the phrase "living with" in this insurance contract unambiguously requires a party to have at least some regular, personal contacts with the insureds' home and there was no evidence of such contacts here, we will affirm the directed verdict in favor of the insurer St. Paul.
 
 GARTH, Circuit Judge, dissenting:
 
 20
 I do not normally file a dissenting opinion in a diversity case, particularly where the only issue presented involves the coverage of an "umbrella" insurance policy. I do so in this appeal, however, because:
 
 
 21
 1. The majority has ignored Third Circuit precedents which bar directed verdicts when material facts are in issue and which require that issues of ultimate material fact be resolved by a jury even when the underlying historical facts are largely or entirely undisputed;[1] and
 
 
 22
 2. The majority has failed or refused to recognize the applicability of Pennsylvania law in at least these particulars:
 
 
 23
 a. The term "living with," in a contractual context, is a matter of fact, not a matter of law;[2]
 
 
 24
 b. The patent ambiguities that appear in St. Paul's contract, in terms of both the meaning to be accorded to the term "living with" and the relevant time period, must be construed against St. Paul;[3]
 
 
 25
 c. A contract of insurance reflects the intent of the parties at the time that it was entered into;[4]
 
 
 26
 d. Pennsylvania law provides that an individual may "live" in more than one place, residence, or home at the same time;[5] and
 
 
 27
 e. It is for the insurer to define, refine, and qualify the terms in its policy to cure any patent or latent ambiguity; the risk of a failure to do so, under Pennsylvania law, rests with the insurer.[6]
 
 
 28
 While the majority has acknowledged some of these concepts, it has ignored certain salient facts (such as Andrew's status as a student, as well as the evidence of record that Andrew physically resided at his parents' home at a time prior to the accident and during at least part of the term of the policy). In addition, in order to reach the conclusion that the district court judge did not err in removing this case from the province of the jury, the majority has had to hold that the St. Paul policy at issue here is neither ambiguous with respect to the meaning of the term "living with" as it applies to Leonard Klinghoffer's son Andrew, nor ambiguous with respect to the relevant time at which the term "living with" must be measured for purposes of coverage under the policy. The majority, in affirming the district court, has therefore held that Andrew was "living at" the Pine Street apartment and, thus, was not "living with" his parents at Rittenhouse Square.
 
 
 29
 I do not claim that Andrew lived either at Pine Street or at Rittenhouse Square. Indeed, it is not the role of this court to determine with whom Andrew was living at the relevant time, or what the relevant time was. My position is simply that, in the context of the present record, after two days of trial sufficient facts were introduced on either side of the question (whether Andrew did or did not "live with" his parents) to permit a reasonable jury to reach either conclusion. Under such circumstances, a directed verdict may not be granted. Rather, the entire congeries of fact that has been developed must be submitted to the jury for its determination as to when and whether Andrew "lived with" his father within the meaning of the policy drawn by St. Paul.
 
 
 30
 It is because the district court refused to permit the jury to answer this question and to find these facts, and because the majority has assumed the role of an appellate factfinder rather than the role of a reviewing court, that I find it necessary to respectfully dissent. See, e.g., Linmark Associates, Inc. v. Township of Willingboro, 535 F.2d 786, 810 (3rd Cir.1976) (Gibbons, J., dissenting) (describing the inversion of the roles of trial and appellate courts created by the majority's appellate factfinding), rev'd 431 U.S. 85, 97 S.Ct. 1614, 52 L.Ed.2d 155 (1977).
 
 I.
 
 31
 I begin my analysis with the standard of review on appeal of a directed verdict. Our review of a directed verdict is plenary. "A motion for a directed verdict should be granted only if, viewing the evidence in the light most favorable to the non-moving party, there is no question of material fact for the jury, and any verdict other than the one directed would be erroneous under the governing law." MacLeary v. Hines, 817 F.2d 1081, 1083 (3rd Cir.1987). As a reviewing court, we are therefore bound to construe any disputed evidentiary issues in favor of the appellants (Lewis et al., the declaratory judgment defendants). In doing so, we are required to determine whether under applicable law there is any "question of material fact" for the jury.
 
 
 32
 Because this is a diversity action, I agree with the majority that we are called upon to predict how the Pennsylvania courts would decide the instant matter, and to apply Pennsylvania law. Under Pennsylvania law, where a provision of an insurance policy is ambiguous, it must be construed in favor of the insured. Hunyady v. Aetna Life & Casualty Co., 396 Pa.Super. 476, 578 A.2d 1312, 1313 (1990), rehrng. denied; Loomer v. M.R.T. Flying Service, Inc., 384 Pa.Super. 244, 246, 558 A.2d 103, 105 (1989). The Pennsylvania Supreme Court has recently reaffirmed its longstanding view that ambiguous insurance policies must be interpreted in favor of the insured:
 
 
 33
 The principles governing the interpretation of a contract of insurance are ... well settled. Review is aimed at ascertaining the intent of the parties as manifested by the language of the written instrument. Where the provision of the policy is ambiguous, the policy provision is construed in favor of the insured and against the insurer, the drafter of the instrument.
 
 
 34
 Bateman v. Motorists Mutual Ins. Co., --- Pa.Super. ----, 590 A.2d 281 (1991). "Of particular significance," the court stated in its holding,
 
 
 35
 is that the drafter of this policy did not simplify matters by substituting the phrase 'limits of liability' for the disputed text as was done in [another case].
 
 
 36
 --- Pa. at ----, 590 A.2d 281.
 
 
 37
 In the present case, we are confronted with a policy whose drafter--The St. Paul Mutual Fire and Insurance Company ("St. Paul")--similarly failed to simplify matters by substituting an unambiguous phrase carrying a more precise and refined meaning[7] for the ambiguous term "living with." St. Paul failed to define narrowly the equivocal and intricate term "living with," even though it could easily have done so in plain and simple language. For example, the phrase could have been limited temporally, and in terms of physical presence, by substituting the phrase "physically living with the insured at the time of the accident," or "physically living with the insured at the time of the inception of the policy," depending upon the intention of the parties--which is itself a fact determination. Cf. Pullman-Standard v. Swint, 456 U.S. 273, 102 S.Ct. 1781, 72 L.Ed.2d 66 (1982) (intent to discriminate is a pure question of fact).
 
 
 38
 St. Paul did not, however, include any such specific terms, thus leaving room for several different interpretations of the relevant clause in the policy. In particular, it left open the meaning to be given to the term "living with," and the criteria or indicia relevant to determining whether or not a person "lives with" the policyholder.
 
 
 39
 The policy language also leaves open to question the relevant point in time, or time period, during which the term "living with" is to be measured. It cannot be determined as a matter of law from the language of the policy whether the policy was meant to cover all relatives "living with" the policyholder at the time the policy was executed, or all relatives "living with" the policyholder at the time of the accident, or all relatives "living with" the policyholder at the time of the claim. Without ascribing particular time periods when the term "living with" is to be construed, at the very least the policy is murky and enigmatic in this respect, and is for the jury to fathom.
 
 
 40
 The majority claims that it would be unreasonable to interpret the policy so as to permit an insured to effect coverage after an accident occurs. Maj. Op. at 1433. But that is not our case. The policy which Leonard Klinghoffer purchased became effective in February 1983. Sometime between February and August 1983, Andrew left his temporary teaching position and returned to his parents' home at the Rittenhouse address.[8] The accident giving rise to this appeal did not occur until October 1983. As the record discloses, Andrew may have lived physically with his parents during the early part of the year when the policy's coverage was in effect, and even if not physically residing there, he could well have had sufficient contacts with his parents' home for the jury to conclude that he was "living there" within the meaning of the policy.
 
 
 41
 Such an interpretation is particularly plausible given the breadth with which the policy, under its own terms, is to be construed. The policy describes itself as granting unusually broad coverage to the insured and his family. The first sentence of the policy provides:
 
 
 42
 This insurance policy is designed to give you and your family protection against many liabilities not covered by your other policies.
 
 App. at 163. It further states:
 
 43
 [W]e give you broader coverage than you're likely to have in any of your other policies. Our definitions of accident or incident, property damage, and personal injury are unusually broad.
 
 
 44
 App. at 166. These preliminary statements, moreover, are not mere preamble to the "actual" terms of the policy. The policy suggests that these introductory statements may be controlling if there is any doubt whether a specific claim is covered. App. at 167.
 
 
 45
 Thus, a reasonable jury might have found that the policy contains expansive definitions of "living with," and of the relevant time period during which the "living with" must occur for a party to be covered. The jury might further have found the circumstances of Andrew's accident to fit within the policy's expansive definitions in either (or both) of these two areas. In such circumstances, a directed verdict cannot be granted.
 
 II.
 
 46
 The majority opinion defines "living with" as having "some regular personal contacts with the insured's home." Maj. Op. at 1429. While I do not dispute that the majority's definition may be plausible or reasonable, had the courts of the Commonwealth not spoken, this court does not sit to create reasonable definitions of terms, or to impute such definitions to the courts of a state, when that state's courts have already determined the issue and construed the relevant term.
 
 
 47
 In discussing the term "living with," the majority asserts that "Pennsylvania courts have not decided the meaning of the exact phrase at issue here." Maj. Op. at 1431. Having thus freed itself of the binding constraints of Pennsylvania's case law regarding this term by declaring such case law nonexistent, the majority turns first to a dictionary definition of the term, and secondly to the Pennsylvania courts' definition of a "resident"--a different term, not appearing in the insurance policy at issue here--to determine how this case should be decided.[9] In fact, however, the Pennsylvania courts have interpreted the precise phrase at issue before us--the phrase "living with." In Sheaffer v. Penn Dairies, Inc., 161 Pa.Super. 583, 56 A.2d 368, 369 (1948), the court held:
 
 
 48
 "Living with" does not always import physically dwelling together in the same house. Icenhour v. Freedom Oil Works Co., 136 Pa.Super. 318, 7 A.2d 152; Id., 145 Pa.Super. 168, 20 A.2d 817; Dietrich et al. v. Hudson Coal Co., 117 Pa.Super. 193, 177 A. 606.
 
 
 49
 The very term which we are to construe under Pennsylvania law, therefore, has already been interpreted by the courts of that state, which have unmistakably stated that parties need not necessarily be dwelling together in the same house to be legally considered as "living with" each other.
 
 
 50
 The Sheaffer court's interpretation of "living with" has been reaffirmed in a more recent Pennsylvania decision, E & S Fabricating & Welding Co. v. Workmen's Compensation Appeal Board, 51 Pa.Cmwlth. 111, 413 A.2d 1182 (1980), which noted that "our courts have clearly interpreted the term 'living with,' " id. 413 A.2d at 1184 (citing Sheaffer ).
 
 
 51
 The Sheaffer court, moreover, went on to further construe the term "living with" by holding:
 
 
 52
 Whether parties are "living with" each other is a question of fact, ... to be determined, not by consulting only one facet of the relationship, but by inspecting the whole picture.
 
 
 53
 56 A.2d at 369. Questions of fact, needless to say, are to be determined by the factfinder--in this case, the jury. In the particular context of this case, where numerous factors were introduced at trial, by both parties, to establish when, where and with whom Andrew lived,[10] a complicated question of fact has arisen requiring inspection of the "whole picture" by the jury. Clearly, then, the question whether or not Andrew Klinghoffer was living with his father is, under applicable (Pennsylvania) law, a "question of material fact for the jury" requiring reversal of the directed verdict pursuant to MacLeary v. Hines, 817 F.2d at 1083.
 
 
 54
 In interpreting the term "living with," the reported Pennsylvania court decisions, as I have pointed out, are consistent in holding that "living with" someone does not always import that an individual must physically dwell together with the other in the same house. Moreover, they hold that whether a person "lives with" another is a question of fact to be determined by inspecting the whole picture--a task, obviously, which is reserved to the finder of fact. In this court we have consistently held that even where all the historical facts are undisputed, the ultimate question of material fact is reserved for the jury and cannot be decided by the district court judge in granting a directed verdict.[11] Indeed, even though I do not believe that the majority's definition of "living with" represents Pennsylvania law, given Andrew's physical presence in the Klinghoffer home both before and after the accident (see supra note 8), a jury might have been hard pressed to find for St. Paul even if the district court had charged the definition now espoused by the majority.
 
 
 55
 The majority also claims that my reliance on the Pennsylvania cases which define and construe the term "living with" is misguided because they arise in the context of husband and wife rather than father and son. Maj. Op. at 1432. Regrettably, the majority has not explained in what respect this difference in relationship affects the meaning of the term "all relatives living with you" which is at issue in the St. Paul policy, see App. at 167. It would appear, despite the majority's disclaimer, that a wife living with a husband and a father living with a son would all be equally covered by the terms of the policy as construed under the Pennsylvania cases I have cited. Hence, it was the law of Pennsylvania as announced in those cases that the district court should have charged in instructing the jury to apply the law to the facts which it found.
 
 III.
 
 56
 A further basis upon which Andrew Klinghoffer may be found by a reasonable jury to have been living with his father has unfortunately also been overlooked by the majority. The majority concedes that it might find Andrew Klinghoffer to be "living with" his parents if he were a member of the military, as was the case in United Services Auto Ass'n v. Evangelista, 698 F.Supp. 85 (E.D.Pa.1988) (holding a serviceman to be a member of his parents' household for purposes of insurance coverage even while he was stationed elsewhere). The majority also concedes that a similar result might obtain if Andrew were "a full-time student." Maj. Op. at 1432.[12] But the majority inexplicably goes on to state that "this case does not present such a situation." Maj. Op. at 1432. Uncontradicted evidence was presented at trial establishing that Andrew Klinghoffer was, in fact, a student at the time of the accident.[13] While he was apparently not enrolled in a full-time degree program, he was taking college courses at the University of Pennsylvania. Evidence of record also established that Andrew was receiving financial support from his father, which might have further suggested to the jury the similarity between Andrew's position and that of many other students. These circumstances, particularly in light of the majority's position that a student could qualify as "living with" his or her parents, even when spending months away from the parents' home in a separate abode, further demonstrate that the question of whether Andrew was "living with" his father should have been determined by the jury.
 
 IV.
 
 57
 St. Paul makes much of the fact that approximately six weeks before the accident, Andrew Klinghoffer began renting an apartment, together with a roommate, at 4800 Pine Street in Philadelphia, where he generally ate and slept and kept most of the belongings he used regularly. Ignoring the record and the jury's function as factfinder, St. Paul asserts that these facts indicate that Andrew was in fact residing with his roommate at the Pine Street apartment. However, a reasonable jury could find that he was also "living with" his parents. Such a finding would be supported by evidence of record and would be consistent with Pennsylvania law. Pennsylvania law is clear that a person can live in more than one place. See, e.g., McCarthy v. Philadelphia Civil Service Commission, 19 Pa.Cmwlth. 383, 339 A.2d 634, 636 (1975) ("It is well settled that a person can have more than one residence.")[14] Cf. National Development Corp. v. Triad Holding Corp., 930 F.2d 253 (2d Cir.1991) (holding that one of the twelve or so homes throughout the world among which the individual defendant divided his time constitutes a "dwelling house or usual place of abode" for purposes of service of process, even though that home is not the defendant's principal domicile and even though he may spend comparatively little time there).
 
 V.
 
 58
 In short, the majority errs in holding that the district judge could properly have removed this case from the province of the jury. Two aspects of the St. Paul insurance policy at issue here are ambiguous: the meaning of the term "living with" as it applies to Andrew Klinghoffer's connections to his parents' home, and the issue of the relevant time at which the "living with" is to be measured for purposes of coverage under the policy. Pennsylvania law requires that any ambiguity in an insurance contract must be construed in favor of the policyholder and against the insurance company that drafted the policy. By slighting the record and the established standard in this court for granting a directed verdict, the majority has given no more than lip service to the established principles of law which I have outlined at the outset of this dissent. Thus I fear that the majority's opinion cannot help but lead the bench and bar astray.
 
 
 59
 I would hold that the district court erred in granting a directed verdict to St. Paul, and I would therefore reverse and remand for a jury trial.
 
 
 
 [1]
 The following parties were named as defendants in the declaratory judgment action: Barbara Lewis, Nya Lewis, John Mincy, and Shahida Mincy, the four parties injured in the accident; Khalid Lewis, one of the deceased; Sheila Furey, administratrix of the estate of the other deceased, John Furey; the Delaware River Port Authority of Pennsylvania and New Jersey; and Andrew Klinghoffer. We refer to these parties collectively as "the defendants."
 
 
 [2]
 All the declaratory judgment defendants, except Klinghoffer, appealed the district court's disposition of this action. They filed four separate appeals, which we consolidated for purposes of briefing and disposition
 
 
 [3]
 The district court applied Pennsylvania law and neither party challenges this choice of law on appeal. Although it is not apparent from the record before us why the district court applied Pennsylvania law, we assume the court made this choice under Pennsylvania's choice of law rule requiring application of the law of the state with the greatest interest in the litigation. Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496, 61 S.Ct. 1020, 1021-22, 85 L.Ed. 1477 (1941) (in diversity, district court must apply choice of law rules of state in which it sits); Griffith v. United Air Lines, Inc., 416 Pa. 1, 203 A.2d 796 (1964) (court must apply law of state with greatest interest in outcome of litigation)
 
 
 [1]
 E.g., Brown v. Caterpillar Tractor Co., 696 F.2d 246 (3rd Cir.1982); Rosenthal v. Rizzo, 555 F.2d 390 (3rd Cir.1977)
 
 
 [2]
 See Sheaffer v. Penn Dairies, Inc., 161 Pa.Super. 583, 56 A.2d 368, 369 (1948)
 
 
 [3]
 See Bateman v. Motorists Mutual Ins. Co., --- Pa. ----, 590 A.2d 281 (1991)
 
 
 [4]
 See Tennant v. Hartford Steam Boiler Inspection & Ins. Co., 351 Pa. 102, 40 A.2d 385, 387
 
 
 [5]
 See McCarthy v. Philadelphia Civil Service Commission, 19 Pa.Cmwlth. 383, 339 A.2d 634, 636 (1975)
 
 
 [6]
 See Bateman v. Motorists Mutual Ins. Co., --- Pa. ----, 590 A.2d 281 (1991)
 
 
 [7]
 See Amica Mutual Ins. Co. v. Donegal Mutual Ins. Co., 376 Pa.Super. 109, 545 A.2d 343, 346 (1988)
 
 
 [8]
 On cross-examination of Leonard Klinghoffer, the following exchange occurred:
 Q: Now after [Andrew's] time up in Pottsville or Pottstown teaching, isn't it true that he came back to the Rittenhouse address?
 A: I believe he did.
 App. at A-58. (Indeed, Andrew also physically lived at Rittenhouse Square during the three month period following the accident, which occurred on October 16, 1983.)
 
 
 [9]
 The only case the majority cites in support of its own definition of "living with" is Amica Mut. Ins. Co. v. Donegal Mut. Ins. Co., 376 Pa.Super. 109, 545 A.2d 343 (1988). The majority argues that Amica "affirmed the trial court's finding that the daughter did not live with the insured." Maj. op. at 1432. In Amica, first of all, the factfinder took into account a number of facts and circumstances of record and then found as a fact that the daughter did not "live with" the insured. 545 A.2d at 344, 345. In the instant case, by contrast, the jury, as factfinder, was never given the opportunity to make any findings of fact, since the district court judge directed a verdict. Secondly, the Pennsylvania Superior Court in Amica was reviewing a finding of fact made by the Court of Common Pleas. It therefore applied a deferential standard of review--merely considering "whether the trial court's findings are supported by competent evidence." 545 A.2d at 345. Here, by contrast, our standard of review (as I have pointed out in text) is plenary, and we must view all the evidence in the light most favorable to the appellants
 
 
 [10]
 Andrew testified that he was a student at the University of Pennsylvania and that he had begun renting an apartment at 4800 Pine Street apartment about six weeks before the accident. Andrew paid his half of the rent and other household expenses for the apartment, kept his daily belongings at the apartment, and generally slept there and ate his meals there. Although some of his mail was delivered to the Pine Street apartment, much of it continued to be delivered to his parents' house. Andrew went to his parents house with some frequency for visits, holidays, to pick up mail, and so forth. Andrew had his own room at his parents' house, and he left some of his belongings in that room. Although Andrew testified at trial that he lived with his roommate at the Pine Street apartment, he conceded that his driver's license, FAA pilot's license forms, bank statements, and 1982 and 1983 tax return forms bore the address of his parents' house, located in Rittenhouse Square in Philadelphia, and that he used his parents' address on his checks. Of particular note are the facts that Andrew consistently hand-wrote the telephone number of his parents' condominium on his checks, and that on the day he was admitted to the hospital immediately after the accident, hospital records reflect that he gave the hospital the address of his parents' condominium as his own address. There was also evidence that Andrew continued to receive financial support from his father
 
 
 [11]
 Numerous cases in this Circuit have held that a question of the parties' contractual intent in using certain terms must be reserved for the jury. Although this issue generally arises in the context of motions for summary judgment, the principle is the same here, where a directed verdict was granted. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986) (standard for summary judgment "mirrors the standard for a directed verdict")
 Even when there is no dispute as to historical fact, a question of ultimate material fact may still exist as to what was intended. Summary judgment--or, as in this case, a directed verdict--is then precluded. For example, in Brown v. Caterpillar Tractor Co., 696 F.2d 246 (3rd Cir.1982), we reversed a grant of summary judgment to the defendant on the grounds that what the parties had intended by the language of the contract was a factual issue for the jury even though there was no dispute as to the historical facts. In Rosenthal v. Rizzo, 555 F.2d 390 (3rd Cir.1977), we reversed a summary judgment entered against an employee who alleged wrongful discharge based on his political affiliation. We noted that the employee's claim hinged on whether he was a "policymaker" or not. The district court had apparently "believed that Rosenthal's status as a policymaker vel non was a question of law, for ... the court indicated that there were no facts in dispute." 555 F.2d at 393 n. 3. We disagreed, however, holding that the question of whether the employee was a "policymaker" was itself a disputed fact. One judge, in dissent, emphasized that "no dispute existed among the parties as to the actual, historical or narrative facts of the case." 555 F.2d at 394 (Aldisert, J., dissenting). Nonetheless, the majority concluded that there was an issue of fact to be resolved at trial.
 In the instant case, by contrast, the majority engages in just the sort of weighing of the evidence on either side that is the exclusive province of the jury. The majority appears to believe that whether Andrew was living with his father is a question of law. It is not. It is a question of fact, albeit an ultimate fact that is to be derived from historical facts upon which the parties are in near-unanimity. I note that there is only near-unanimity on the historical facts because there is one key historical fact which the parties do not agree on and which is very much within the province of the jury, namely what the parties intended by the term "living with" as included in the policy. See Pullman-Standard v. Swint, 456 U.S. 273, 102 S.Ct. 1781, 72 L.Ed.2d 66 (1982) (intent to discriminate is a pure question of fact; no distinct status may be accorded to facts that are characterized as "ultimate.") The term "living with" in the policy must therefore be read and construed by the jury.
 
 
 [12]
 I am at a loss to determine the significance of the qualification "full-time" in the majority opinion. Surely the majority cannot mean that whether a student can be found to be "living with" his or her parents depends on whether his attendance at a university is full-time or part-time. A determination that relies on such a narrow factual distinction must obviously be left to the jury, particularly since here St. Paul bore the risk of non-persuasion, and the record in this respect does not reveal the number of courses which Andrew was taking, the time which he devoted to his studies, or any of the circumstances surrounding his scholastic activities
 
 
 [13]
 Andrew Klinghoffer's direct testimony, App. at A-92, includes the following exchange:
 Q: ... you were also taking some graduate courses at the University of Pennsylvania, were you not?
 A: They were undergraduate courses. I was a graduate though at the time taking undergraduate courses.
 
 
 [14]
 The McCarthy case goes on to note that a person may, however, only have a single "domicile." The insurance policy at issue here, however, did not use any such specific legal term in defining its coverage, so that the exclusiveness of one's legal "domicile" is irrelevant