376 Pa. Superior Ct. 109 (1988)
545 A.2d 343
AMICA MUTUAL INSURANCE COMPANY,
v.
DONEGAL MUTUAL INSURANCE COMPANY and as Interested Parties: Elizabeth Hagerty; Carol Applegate; Tracey Applegate Commonwealth of Pennsylvania, Dept. of Transportation; Peter Kweller, a Minor, by Mark Kweller His Guardian; Mark Kweller and Judy Kweller, His Wife; and Dr. Robert W. Hagerty Appeal of: Peter Kweller, a Minor, by Mark Kweller, His Guardian, Mark Kweller and Judy Kweller, His Wife, Appellant.
AMICA MUTUAL INSURANCE COMPANY, Appellant,
v.
DONEGAL MUTUAL INSURANCE COMPANY and as Interested Parties Elizabeth Hagerty, Carol Applegate, Tracy Applegate Commonwealth of Pennsylvania Dept. of Transportation Peter Kweller a Minor by Mark Kweller, His Guardian Mark Kweller and Judy Kweller, His Wife and Dr. Robert W. Hagerty.
Supreme Court of Pennsylvania.
Argued February 11, 1988.
Filed July 11, 1988.
*111 Patrick J. Reilly, Allentown, for appellants (at 2524).
Michael E. Moyer, Assistant District Attorney, Allentown, for AMICA Mut., appellant (at 2564) and appellee (at 2524).
Rick Long, Wyomissing, for Donegal, appellees (at 2524 and 2564)
Before TAMILIA, HOFFMAN and HESTER, JJ.
HESTER, Judge:
Amica Insurance Company (appellant at No. 2564 Philadelphia 1987) and Peter Kweller, a minor by his parents Mark and Judy Kweller (appellants at No. 2524 Philadelphia 1987), filed these cross-appeals from an order entered pursuant *112 to a declaratory judgment action, holding that appellee-Donegal Mutual Insurance Company is not responsible for coverage of Elizabeth Hagerty in connection with an automobile accident. We affirm.
On June 1, 1984, eighteen year-old Elizabeth Hagerty was operating an automobile with two passengers in Lehigh Township, Northampton County, Pennsylvania, when an accident occurred causing the three to sustain injuries. One of the passengers, Peter Kweller, a minor, instituted suit through his parents, naming Elizabeth Hagerty as one of the defendants. This action is not presently before us. Appellee-Donegal Mutual Insurance Company ("Donegal") which had issued a $500,000.00 liability policy to Elizabeth's father, Dr. Robert Hagerty, refused to provide liability coverage for Elizabeth. Appellant-Amica Mutual Insurance Company ("Amica"), which had issued a policy to Elizabeth's mother, filed a declaratory judgment action against Donegal seeking to have the latter declared liable for coverage of the accident.
A non-jury hearing was held on January 21, 1987. The major issue was whether the Donegal policy provided coverage for Elizabeth. In pertinent part, the policy provided coverage for family members of the insured, Dr. Hagerty, who were residents of his household.[1] On March 20, 1987, a decree nisi and adjudication were entered by the court holding that Elizabeth was not a resident of Dr. Hagerty's household at the time of the accident, June 1, 1984, but that she resided with her mother, Elizabeth Douglas. Therefore, Donegal had no duty to provide coverage. Appellants filed post-trial motions which were denied by the order of August 11, 1987. These timely cross-appeals followed.
In reviewing an adjudication in a non-jury proceeding, we must determine whether the trial court's findings are supported by competent evidence and whether the trial court committed error in any application of the law. Brenna v. *113 Nationwide Insurance Co., 294 Pa.Super. 564, 440 A.2d 609 (1982). Any ambiguity in insurance policy terms must be construed in favor of the insured. State Farm Insurance Co. v. Bullock, 316 Pa.Super. 475, 483, 463 A.2d 463 (1983); Krager v. Foremost Insurance Co., 304 Pa.Super. 390, 450 A.2d 736 (1982). If a court is to err in ascertaining the legislative intent behind the No-Fault Act in close, doubtful cases, it should do so in favoring of extending coverage. Steppling v. Pennsylvania Manufacturers Assoc. Ins. Co., 328 Pa.Super. 419, 477 A.2d 515 (1984).
Elizabeth Hagerty was born in 1966. Her parents separated in 1972 and were divorced in 1974. From 1972 to February 28, 1982, Elizabeth was in the custody of her mother; they lived in Allentown, Pennsylvania. On February 28, 1982, Elizabeth went to live with her father, Dr. Robert Hagerty, in Bethlehem, Pennsylvania. During the time she lived with her father, Elizabeth continued to attend a high school near her mother in Allentown. Her father transported her to and from school daily. Elizabeth moved back with her mother for the school year of 1983 to 1984, her senior year in high school. Although Elizabeth stated that she would have preferred to remain with her father since she got along better with him, she moved back to her mother's house due to its proximity to her high school. Elizabeth's mother lived twelve blocks from the school while her father lived six to eight miles from it. Elizabeth's involvement in extracurricular activities at school made it inconvenient for her to live with her father, as the travel time between his house and the school was approximately one-half hour under light traffic conditions.
During the 1983 to 1984 school year when she lived at her mother's house, Elizabeth testified that she stayed overnight at her father's house three to five times a month. Elizabeth's father testified that she stayed overnight only twice during the entire school year. The trial court found that Elizabeth made "sporadic" visits to her father's house, Trial Court opinion of 3/20/87, at 3, and that "she did not spend a substantial amount of time at her father's house." *114 Trial Court opinion of 8/11/87, at 6. During that time, Elizabeth had a closet or two full of clothes at her father's house, approximately forty pairs of shoes, books, cosmetics, stuffed animals, tennis equipment, and a pet rabbit. She received mail there as well.
At the time of the accident, June 1, 1984, Elizabeth was still residing at her mother's house. Elizabeth planned to leave the state to attend college at the end of June; she intended to live with her father in the time between graduation and her departure. Following the accident, she stayed with her mother for two weeks, then moved to her father's house. However, she stayed there only a short time as her injuries made moving about very difficult and the house had no bathroom on the floor where she slept. She moved back to her mother's house and planned to stay there only until she was physically able to move back with her father.
Dr. Hagerty did not list Elizabeth as a resident of his household in either his 1983 or 1984 tax returns. Elizabeth's school records for the 1983-1984 school year listed her as a resident of her mother's house.
In holding that Donegal is not responsible for providing coverage or defending Elizabeth with respect to the accident, the trial court reasoned, "The question of residency is not a question of intention, but rather a question of physical fact, and the court found it a physical fact that Elizabeth resided with her mother at the time of the accident and for at least ten months prior thereto." Trial Court opinion 8/11/87, at 5.
Appellants-Kwellers argue that the trial court erred in holding that "residence" is a matter of physical fact and not intention.
We find no merit to this contention. In determining the meaning of the word "residence," both its object and context must be kept in view. Robinson v. Robinson, 362 Pa. 554, 67 A.2d 273 (1949). Donegal argues that the policy language, providing coverage to family members of the insured who are residents of the insured's household, *115 evidences that the objective of the policy was to limit coverage to those family members who actually live in the same household as the insured. We find this persuasive. In Krager v. Foremost Insurance Co., 304 Pa.Super. 390, 450 A.2d 736 (1982), an insurance policy issued to plaintiffs' mother provided coverage to relatives of the insured who were residents of her household. Plaintiff lived in his own mobile home from November to April of each year and with his mother from April to November. Plaintiff was involved in an automobile accident while living with his mother. We found that he was clearly a resident-relative of the insured and was, therefore, covered by his mother's policy. We wrote:
The Courts of this Commonwealth have historically recognized the classical definitions of the words domicile and residence. Domicile being that place where a man has his true, fixed and permanent home and principal establishment, and to which whenever he is absent he has the intention of returning.
Residence being a factual place of abode. Living in a particular place, requiring only physical presence.
Though the two words may be used in the same context, the word resident as used in the policy, without additional words of refinement, i.e., permanent, legal, etc., would carry the more transitory meaning.
The appellant having written the contract, any ambiguity in its terms will be construed against it. Miller v. Prudential, 239 Pa. Superior Ct. 467, 362 A.2d 1017 (1976).
Id., 304 Pa.Superior Ct. at 393-394, 450 A.2d at 738.
See also Greenwood v. Hildebrand, 357 Pa.Super. 253, 515 A.2d 963 (1986); Laird v. Laird, 279 Pa.Super. 517, 421 A.2d 319 (1980).
Instantly, we find the common law definition of "resident" applicable to the policy language in question. The policy provides coverage for family members of the insured who are residents of his household. This language contains no words of refinement, such as "legal" or "permanent" which might suggest a less transitory meaning. Rather, we *116 construe the language to limit coverage to those who actually reside in the household of the insured.
We find no error in the trial court's determination that, as a matter of physical fact, Elizabeth resided at her mother's house at the time of the accident. The evidence clearly shows that Elizabeth lived with her mother over the course of the school year up to and including the date of the accident. We see no reason to find erroneous the trial court's finding that Elizabeth made only "sporadic" visits to her father's house over the course of the ten months she lived with her mother and that she spent no significant time there. Moreover, we do not find erroneous the court's holding that the personal items which Elizabeth kept at her father's house at the time she lived with her mother were for convenience and did not evidence that she physically lived there.
Appellants cite Boswell v. South Carolina Insurance Co., 353 Pa.Super. 108, 509 A.2d 358 (1986), in support of their assertion that in determining residence status, it is the intention of the party, not his physical presence, which is determinative. In Boswell, plaintiff, who did not own a car, was injured in an automobile accident. Plaintiff's son, a member of the U.S. Army stationed in Korea, did own a car, which was insured by the South Carolina Insurance Company. The policy provided coverage for relatives in residence in the same household as the insured. We held that plaintiff was covered as he was a relative in residence in the same household as the insured. In reaching this conclusion, we initially recognized the historic difference between residence and domicile. However, since the case arose under the No-Fault Act, we focused on the Act's definition of "insured." The Act, 40 P.S. § 1009.103, defines "insured" as follows:
(A) an individual identified by name as an insured in a contract of basic loss insurance complying with this act; and
(B) a spouse or other relative of a named insured, and a minor in the custody of a relative of a named insured if. . .

*117 (ii) in residence in the same household with a named insured.
An individual is in residence in the same household if he usually makes his home in the same family unit, even though he temporarily lives elsewhere.
Based on this, we concluded that the definition which the legislature conferred upon the term "residence" is closer in meaning to the common law definition of domicile than it is to residence. Applying the definition of "insured" under the Act to the facts of the case, we found no practical difference between the situation of the plaintiff's son, a member of the military stationed in Korea, and the portion of the Act providing coverage for students temporarily living away from home. We held that since the son's true and permanent home was in the plaintiff's household, the plaintiff was covered under the policy. Physical presence was not required by the Act; rather, the Act only required that the insurance claimant usually be in residence in the household.
Boswell is distinguishable as it involved a claim for No-Fault basic loss benefits. The instant case does not.[2] Since the Act's definition of "insured" is expressly applicable only for "an insured in a contract of basic loss benefits," the No-Fault definition is not binding on the instant fact situation.
Moreover, even if we were to apply the rationale espoused in Boswell, we would find the instant case distinguishable. The No-Fault Act expressly made an exception *118 for college students who usually make their home in the same family unit. Boswell extended this rationale to military personnel who, by the nature of their service, must reside away from their usual abode. The instant case is qualitatively different from both situations. Elizabeth lived with her mother for ten years until she moved to her father's home in 1982. She stayed there for approximately one and one-half years. In 1983, Elizabeth and her parents agreed it would be beneficial for Elizabeth to again reside with her mother. We hardly think it equitable to regard Elizabeth's move to her mother's house as "temporary," or to say that she "usually" made her home with her father. The trend of the previous twelve years suggest the opposite.
Appellants would have us render Elizabeth's intention the sine qua non in determining her residency status. If intention were the test to determine residency status for purpose of interpreting the insurance language at issue herein, many children of divorced or separated parents could be said to "reside" in the home of one parent even though they actually live with the other. Therefore, as a practical matter, we refuse to regard Elizabeth's move to her mother's house as the equivalent of a move to an army barracks or a college dormitory. The filial bond calls for a qualitatively different analysis.[3]
Appellants-Kwellers and Amica also argue that Pennsylvania should adopt a test of dual residency whereby a child *119 of divorced or separated parents could be held to reside with both. They contend that Elizabeth was a dual resident of both parents' households, and therefore her father's policy with appellee-Donegal covers the accident. Two Common Pleas court decisions are cited in support of this contention, as is Boswell, supra. We found Boswell distinguishable; we shall review the two trial court decisions.
In Miller v. U.S.F. & G., 28 Pa.D. & C.3d 389 (1983), sixteen year-old Charles R. Cullison was involved in an automobile accident on June 13, 1978. At the time, Charles' parents were divorced and Charles primarily resided with his mother. Before the accident, his parents intended for Charles to move into his father's home during the summer of 1978 and to remain there throughout the following school year. Prior to the summer of 1978, Charles visited his father and occasionally stayed overnight. Charles' father carried an insurance policy with Selected Risks Insurance Company which provided coverage for any family member who resided with him. The court held that Charles was a resident of both his parents' households; therefore, his father's policy covered him.
Appellants also cite Nationwide Insurance Co. v. Frazier, 39 Pa.D. & C.3d 254 (1986). There, fifteen year-old Lynda Sue Frazier died as a result of injuries sustained in an automobile accident on May 1, 1984. At the time of the accident, her parents had been separated for more than two years. Her father's insurance policy provided coverage for himself and any family member who resided in his household, including a ward or foster child. Although Lynda Sue was in her mother's custody at the time of the accident, the court found that the child spent approximately five days per week during the winter and two to three days per week in the summer at her father's house. She had her own room at both houses and kept cosmetics at both. Moreover, she kept her ten-speed bicycle at her father's house and her father claimed her as a dependent for tax purposes. The court opined, at 264-265:

*120 Nationwide in this case had the opportunity to clearly define the term `resident of your household,' but failed to do so.
. . . .
The concept of children necessarily belonging to one household has long since passed in our society and our law. The insurance policy itself in this case recognized that a child may be [sic] foster child in the home of the insured and, therefore, afforded coverage.
Neither Miller, supra, nor Frazier, supra, supports the holding appellants would have us reach instantly. Although no Pennsylvania appellate decision has yet decided the issue, we do not disagree that a child of separated or divorced parents may be regarded as a resident of the household of both parents. Such a holding would seem appropriate where, as in Frazier, supra, the child divides his time between the two. Miller, supra, is less compelling. There, the court noted that the child visited his father and "occasionally" stayed overnight. It is not clear whether the child spent significant amounts of time at his father's house. Since resident status is a question of physical fact, as the Miller court conceded, the child's intention in Miller to live at his father's home in the future is not a relevant consideration. The fact that a child's parents live in separate households should not automatically render him a resident of both if, as a matter of physical fact, he lives at one and spends no significant time at the other. As such, the Miller decision is not helpful to the question before us.
In the instant case, we find no error in the trial court's determination that Elizabeth was not a resident of both households. During the school year of 1983 to 1984, she did not spend a "significant and scheduled amount of time at her father's home." Trial court opinion, 8/11/87, at 6. This is borne out by Dr. Hagerty's testimony that Elizabeth stayed overnight only twice during that entire school year. The fact that Elizabeth kept numerous personal items at her father's house does not compel a conclusion that she resided there as a matter of physical fact. Rather, *121 it lends support to the conclusion that she had lived there and that she intended to live there again. These considerations, however, are not pertinent to the present issue.
Appellants-Kweller and Amica also argue that Donegal should be held liable to provide coverage due to the fact that the Donegal policy as well as Dr. Hagerty's application for insurance list Elizabeth as an "operator," which is defined as a "resident in the named insured's household and other principal operators if not resident of the same household." The application indicates that Elizabeth would drive a 1979 Oldsmobile ten percent of the time and a 1968 Oldsmobile ninety percent of the time.
We find no merit to this averment. At the time of the accident, Elizabeth was not driving one of the automobiles listed as covered by the Donegal policy. She was driving a car which did not belong to her father. Appellants point to nothing in the policy, nor are we aware of any provision, which suggests that Donegal should provide coverage for a named operator, other than a resident of the insured's household, who was not driving one of the automobiles which she was listed as covered to drive.
Order affirmed.
NOTES
[1] In Dr. Hagerty's policy, "Covered person" is defined as, "You or any family member. And "family member' means a person related to you by blood, marriage or adoption who is a resident of your household. This includes a ward or foster child."
[2] Appellant-Amica does not dispute, and appellants-Kwellers concede, that it is the liability portion of the policy which is at issue, not the basic loss section. Dr. Hagerty's policy provided $500,000. worth of liability coverage, which appears separate from the basic loss coverage in the policy. The definition of "insured" under the Act, which Boswell interpreted, refers to "an individual identified by name as an insured in a contract of basic loss insurance . . ." Thus, the Act's definition of "insured" and "residence" does not apply to the instant case. The Boswell decision involved a specific statutory provision and the legislative intent in enacting it. Since the common law definition of "residence," as described in Krager, supra, has not been altered, it is appropriate to construe the instant policy's definition in accord with the common law definition.
[3] Appellants cite two cases involving the Juvenile Act, In re G.B., 366 Pa.Super. 9, 530 A.2d 496 (1987), and In Interest of J.S.M., 356 Pa.Super. 360, 514 A.2d 899 (1986), for the proposition that "residence" should be defined as, "Personal presence at some place of abode with no present intention of definite and early removal and with purpose to remain for undetermined period, not infrequently, but not necessarily combined with design to stay permanently." This definition appears to be closer to our definition of "domicile" than "residence." As such, it is not consistent with our decision in Krager, supra. Moreover, if we were to apply this definition to the instant case, we would find that Elizabeth is not a resident of either household. She did not intend to stay at her mother's house, and she had no "personal presence" at her father's house, thus disqualifying her from residency at either. As such, these cases do not aid appellants' contention.