NATIONWIDE MUTUAL INSURANCE COMPANY, Appellant,

v.

Anne Marie BUDD–BALDWIN.

No. 91–1171.

United States Court of Appeals, Third Circuit.

Submitted Under Third Circuit Rule 12(6) July 23, 1991.

Decided Oct. 21, 1991.

---

Bruce A. Irvine, Paul T. Bemiller, Frone-field & Defuria, Media, Pa., for appellant.

Jonathan Wheeler, Wheeler & Bishop, P.C., Philadelphia, Pa., for appellee.

Before SLOVITER, Chief Judge, GREENBERG, Circuit Judge, and McCLURE, District Judge.*

---

* Honorable James F. McClure, Jr., United States District Judge for the Middle District of Pennsyl-vania, sitting by designation.

**OPINION OF THE COURT**

McCLURE, District Judge.

Appellant Nationwide Mutual Insurance Company (Nationwide) appeals from the district court's order granting summary judgment in favor of appellee Anne Marie Budd–Baldwin[1] (Baldwin) and awarding her first party and underinsured motorist benefits for the death of her brother, David Michael Budd (Budd), under an automobile insurance policy Nationwide issued to Baldwin. We reverse, and direct that summary judgment be entered in favor of Nationwide.

## I. BACKGROUND

Budd died from injuries sustained in a one-vehicle accident that occurred on December 16, 1989 while he was a passenger in a vehicle owned and operated by third parties who have not been joined in this lawsuit. At the time of his death, Budd did not own a vehicle and was not a named insured on any automobile policy issued to him.[2] He was, however, listed as an "occasional driver" on a policy issued by Nationwide to his sister, the appellee.

Based on that designation, as well as her contention that Budd was a resident of her household under the terms of the policy, Baldwin sought underinsured and first party benefits from Nationwide. When Nationwide denied coverage, Baldwin filed this declaratory judgment action[3] seeking a determination that she is entitled to recover such benefits.

The district court granted summary judgment in Baldwin's favor, on the basis that Nationwide was estopped from denying coverage because it accepted an additional premium from Baldwin for carrying Budd as an "occasional driver" on her policy.

Nationwide seeks reversal of the district court's order, contending that there is no basis for extending coverage to Budd under the terms of the policy and no basis for estoppel. First, Nationwide argues that Budd is not an insured under the policy, because he does not qualify as a resident relative under the terms of the policy. Second, Nationwide contends that Budd's designation as an "occasional driver" is of no relevance, since persons so designated have no right to recover first party or underinsured benefits if injured while driving or riding in a vehicle other than a vehicle listed in the subject policy. Finally, Nationwide asserts that there is no factual basis for a finding of estoppel.

## II. DISCUSSION

### A. Standard of Review

■ We exercise plenary review of the district court's order on an appeal from summary judgment. *Goodman v. Mead Johnson & Co.*, 534 F.2d 566, 573 (3d Cir. 1976), *cert. denied*, 429 U.S. 1038, 97 S.Ct. 732, 50 L.Ed.2d 748 (1977). Construction of the term "resident" in the policy is a matter of law, *see Myers v. State Farm Ins. Co.*, 842 F.2d 705, 708 (3d Cir.1988); *Ram Construction Co. v. American States Insurance Co.*, 749 F.2d 1049, 1053 (3d Cir.1984), as is the application of principles of estoppel, *see Murray v. Silberstein*, 882 F.2d 61 (3d Cir.1989), over which we exercise plenary review, but to the extent that summary judgment is dependent on the determination of historical facts, it can be granted only if there is no issue of material fact in dispute. *See* Fed.R.Civ.P. 56(c).

### B. Policy terms
#### 1. First party benefits.

The policy Nationwide issued to Baldwin limits coverage for first party benefits to

1. Baldwin initially filed this action in her individual capacity and subsequently amended the caption to indicate that she is suing in her capacity as administratrix of Budd's estate.

2. Budd was co-owner of at least one vehicle used in a business, known as Budd's Plumbing, which he and his brother, Benjamin Budd, owned and operated together. The vehicles used in the business were insured under a policy issued to Benjamin Budd t/a Budd's Plumbing by Selective Insurance Company ("Selective"). Selective was originally named a defendant in this action, but subsequently dismissed for lack of diversity jurisdiction. Selective has denied coverage on the ground that David Budd was not an insured under the policy.

3. 28 U.S.C. § 2201 et seq.

the policyholder and his or her relatives, as defined in the policy. It states (on page 8):

> We will pay First Party Benefits for bodily injury of an insured as a result of an accident that arises out of the maintenance or use of a motor vehicle as a motor vehicle. We will pay these benefits regardless of who is at fault in the accident.
>
> You and your relatives are covered while occupying or injured by any motor vehicle.
>
> \*     \*     \*     \*     \*     \*
>
> For purposes of this coverage:
>
> 1. The words 'YOU' and 'YOUR' mean the policyholder first named in the attached Declarations. They do not include that policyholder's spouse.
>
> 2. 'RELATIVE' means the following residents of your household:
>
> \*     \*     \*     \*     \*     \*
>
> b) anyone related to you by blood, marriage or adoption; and
>
> \*     \*     \*     \*     \*     \*
>
> A relative may live temporarily outside your household.

(emphasis original.)

### 2. Uninsured/Underinsured Motorist Coverage.

The provisions governing underinsured coverage state, from Endorsement 2113A:

**4.** The Nationwide policy language extending coverage to other members of the insured's household tracks the statutory language of the Pennsylvania Motor Vehicle Financial Responsibility Law ("PMVFRL"), 75 Pa.C.S.A. §§ 1701 *et seq.* Section 1702 of the PMVFRL defines an "insured" as any of the following:

> (1) An individual identified by name as an insured in a policy of motor vehicle liability insurance.
> (2) If residing in the household of the named insured:
> (i) a spouse or other relative of the named insured; or
> (ii) a minor in the custody of either the named insured or relative of the named insured.

**5.** The parties agree that Pennsylvania law governs. Pennsylvania conflict of law rules apply, *Klaxon Co. v. Stentor Electric Manufacturing Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941), and clearly warrant imposition of Pennsylvania law. The subject policy was issued in

> We will pay compensatory damages that you or your legal representative are legally entitled to recover from the owner or driver of an uninsured motor vehicle or underinsured motor vehicle because of bodily injury. Damages must result from an accident arising out of the ownership, maintenance or use of the uninsured motor vehicle or underinsured motor vehicle.
>
> Relatives living in your household also have this protection.

### 3. Definitions.

"Relative" is defined in the generally applicable "Definitions" portion of the policy (on page 2) as:

> ... one who regularly lives in your household, related to you by blood, marriage or adoption (including a ward or foster child). A relative may live temporarily outside your household.[4]

### C. Pennsylvania insurance law

■■■ It is this court's obligation to review the claims asserted under Pennsylvania law.[5] The Pennsylvania appellate courts have not been confronted with a case requiring them to construe the exact phrase used here, i.e. who qualifies as a person who "regularly lives" in the insured's household, but the Superior Court[6]

Pennsylvania, to a Pennsylvania resident, to cover vehicles registered and garaged in Pennsylvania. Additionally, the accident occurred in Pennsylvania. Although there are also contacts with New Jersey (Budd lived in New Jersey and was co-owner of a partnership located there.), they do not outweigh the contacts with Pennsylvania, since events in New Jersey bear no relationship to issuance of the policy. See: *American Contract Bridge League v. Nationwide Mutual Fire Insurance Co.*, 752 F.2d 71, 74–75 (3d Cir.1985) and *Griffith v. United Air Lines*, 416 Pa. 1, 203 A.2d 796 (1964).

**6.** "Although lower state court decisions are not controlling on an issue on which the highest court of the state has not spoken, federal courts must attribute significant weight to these decisions in the absence of any indication that the highest state court would rule otherwise." *Wisniewski v. Johns–Manville Corp.*, 759 F.2d 271, 273–74 (3d Cir.1985). Accord: *Adams v. Cuyler*, 592 F.2d 720, 725 n. 5 (3d Cir.1979), *aff'd*, 449 U.S. 433, 101 S.Ct. 703, 66 L.Ed.2d 641 (1981).

has construed similar phrases governing the coverage extended to resident relatives. In *Donegal Mutual Insurance Company v. State Farm Mutual Insurance Company*, 377 Pa.Super. 171, 546 A.2d 1212, 1214 (1988), the policy at issue extended basic loss benefits coverage to a relative who "is in residence in the same household" provided he or she "usually makes his home in the same family unit, even though he temporarily lives elsewhere." Noting that the term "household" is defined by *Black's Law Dictionary*, 666 (5th ed.1979), as a "family living together" and that "household" is generally synonymous with "family" for insurance purposes, the court focused on the living arrangements in effect to ascertain whether the claimant acted like, and was treated as if he were a member of, policyholder's family. The court noted as significant factors whether the claimant paid rent or board to the family, ate his meals with the family, had his own key, received his mail there, kept his personal possessions there, and generally was treated as one would expect a member of the household to be treated.

In *Amica Mutual Insurance Company v. Donegal Mutual Insurance Company*, 376 Pa.Super. 109, 545 A.2d 343 (1988), the policy at issue provided for liability coverage to family members and defined a "family member" as "a person related to you [the insured] by blood, marriage or adoption who is a resident of your household." *Id.*, 545 A.2d at 344, f.n. 1. The Superior Court found that Donegal's definition evidenced its intent "to limit coverage to those family members who actually live in the same household as the insured", *Id.*, 545 A.2d at 346, and in construing the policy, applied the common law definition of resident. The court found that the claimant was entitled to coverage if she resided with the insured "as a matter of physical fact". *Id.*, 545 A.2d at 349. See also: *Krager v. Foremost Insurance Company*, 304 Pa.Super. 390, 450 A.2d 736 (1982) (Residence, as distinguished from domicile, which incorporates an element of intent, is the "factual place of abode." Living in a particular place requires "only physical presence".)

With this background, we turn to the facts before us. Nationwide's definition of a "resident relative" is, if anything, more precise than the definitions construed by the Pennsylvania courts in prior cases. See, e.g., *Stoner v. State Farm Mutual Automobile Insurance Co.*, 780 F.2d 1414, 1417 (8th Cir.1986). ("[T]he phrase 'lives with you' is susceptible of only one interpretation, i.e., actually living in fact, . . ."). It appears to us that Nationwide heeded the Superior Court's suggestion, (See: *Amica, supra*, 545 A.2d at 346), that insurers add "words of refinement" if they intend the term "residence" to mean something more than its common law definition. Nationwide defines a covered resident relative as one who "regularly lives" in the insured's household. Something occurs regularly, if it recurs at "fixed or uniform intervals". *Webster's New Collegiate Dictionary* 974 (7th ed.1973). A person lives where they "occupy a home". *Webster's, supra* at 673. So to "regularly live" somewhere means to occupy that particular home at fixed intervals. When we combine the dictionary definition with the facts of everyday life, it is clear that to occupy a home means to be able to call that place one's own, to claim it as a place where one has a right to be. The word home itself connotes a place where one belongs and can always go with the certainty that he will be taken in. It connotes not only a physical place, i.e. the place where one eats meals, sleeps, socializes and generally spends time when not "otherwise engaged with the activities of life," [7] but a sense of belonging. This definition clearly excludes persons who are mere visitors to the residence, however frequently they may visit and however certain they may be that they will always be taken in. Temporary visits, however frequent or regular, are simply insufficient to establish residency. *Donegal Mutual, supra*, 546 A.2d at 1214, citing *A.G. by Waite v. Travelers Insurance Co.*, 112 Wis.2d 18, 21–22, 331 N.W.2d 643, 645 (1983), ("Something more than mere tempo-

7. *State Farm Mutual Automobile Insurance Company v. Burbank*, 475 N.W.2d 399, 401 (Mich.1991).

rary sojourn is required" to establish residency.).

We need not decide how the definition might be applied to other scenarios or whether it is ambiguous as applied to other factual circumstances.[8] The facts before us are reasonably susceptible of only one interpretation: that Budd's status was that of a visitor to his sister's household and that however frequent or welcome his visits might have been, he did not "regularly live" in her household; it was not the place where he "belonged".

Budd and Baldwin last occupied the same residence on a full-time basis in 1986 when they were both living in a house belonging to their brother. That year, Budd moved into his own apartment in West Chester, Pennsylvania where he stayed for two years. (This was the address listed on the Pennsylvania driver's license in effect at the time of his death.(31a)). Budd then relocated to New Jersey to work in a plumbing business with his brother and lived for a time in a house in Wildwood Crest which belonged to his mother. In the Spring of 1988, he purchased a building lot in Cape May Court House, New Jersey. He built a house on the lot, and moved into it that September and remained there until his death that December. All parties agree that he and his fiancee intended to make that house their home after their planned September, 1990 marriage.

At the time of his death, Budd lived in New Jersey five days a week, worked in New Jersey, owned a business there, and kept his personal belongings there (with the possible exception of certain items which he may have simply left with Baldwin after moving out three years earlier).

Budd's only connection with his sister's Brookhaven residence was his frequent weekend visits there. He stayed with her almost every weekend while visiting his fiancee. Occasionally, usually once every four to six weeks, he would spend the weekend in New Jersey, and his fiancee would come to visit him. See, e.g., *Donegal Mutual, supra,* 546 A.2d at 1214 (Pennsylvania Superior Court found that claimant's principal place of residence was Delaware, where he resided with his mother for at least nine months of the year, not Harrisburg, where he was temporarily residing with his cousin at the time of the accident) and *Amica, supra,* 545 A.2d at 349.

We distinguish this situation from countless others in which persons stay temporarily at the home of another but have a more established connection with the household. The best example which comes to mind is that of children of divorced parents who live with one parent most of the time but routinely spend a portion of each week or month at the residence of the non-custodial parent. In such cases, the child usually, for the sake of convenience if nothing else, has a room to call his or her own in each residence, keeps clothes, books, games, etc. in each residence, and visits at the non-custodial parent's home at regularly scheduled intervals. What distinguishes that situation from the one before us is that the child "belongs" at the other parent's residence, i.e. has a place there to call his or her own, and that the central purpose of the visit is to spend time with the parent. The child is as much a part of that household as he or she is of the household of the parent with primary custody.

The child's situation is quite different from that of Budd, who regularly spent weekends at the home of his grown sibling. However welcome such visits may be and however certain Budd could always be that he was a welcome visitor, there is a qualitative difference. Budd visited, because his sister's house was a convenient place to stay. No one is claiming that the primary purpose of his visit was to spend time with his sister, to foster familial ties with her, etc. To the contrary, everyone concedes that the primary purpose of his visits was to spend time with his fiancee. Additionally, he did not have a room of his own in his sister's house. He sometimes slept in his

---

**8.** Other courts have found the phrase "regularly lives" ambiguous. See, e.g., *Nationwide Mutual Insurance Company v. Diehl,* 768 F.Supp. 140, 141 (E.D.Pa.1990), (available on WESTLAW at 1990 WL 302707) and *Davis v. State Farm Mutual Automobile Insurance Company,* 583 So.2d 225, 228 (Ala.1991), (available on WESTLAW at 1991 WL 82124).

nephew's room, sometimes on the sofa. His status was really little different than that of a boarder or a hotel guest with standing reservations. Although we hesitate to cast his status in such "commercial" terms, since he was undoubtedly a welcome guest, the fact remains that his frequent visitor status did not make him part of the household. He did not "regularly live" with Baldwin under any reasonable interpretation of that term.

The circumstances under which Budd's name was initially added to Baldwin's policy reinforce this impression and lend support to our conviction that neither Baldwin nor Budd could reasonably have expected him to be considered a "resident relative" for insurance purposes.[9] Baldwin added Budd's name to the policy when he was sixteen years old, because at that time, they were both occupying their mother's residence, and he sometimes drove a car registered in her name. Despite all of the subsequent changes in their respective positions, e.g. his move to New Jersey, her relocation to her own household, his name was left on the policy even though the original reasons for adding his name were no longer in existence.

In conclusion, nothing has been presented which would support a finding that Budd was a resident relative under the Baldwin policy, and thereby entitled to first party or underinsured benefits.

■ Plaintiff's reliance on Budd's designation as an occasional driver is equally unavailing. In *Amica, supra,* 545 A.2d at 349, the Pennsylvania Superior Court held that a person listed on the policy as an "operator" could not recover unless at the time of the accident, she was operating one of the automobiles listed as covered in the policy. See also: *Hunyady v. Aetna Life & Casualty,* 396 Pa.Super. 476, 578 A.2d 1312, 1314 (1990), (The Pennsylvania Motor Vehicle Financial Responsibility Law does not require a carrier to provide underinsured motorist benefits to a party who is not an "insured" under its policy). A ruling entitling Budd to underinsured benefits under the Nationwide policy would also be inconsistent with the Superior Court's holding in *Wolgemuth v. Harleysville Mutual Insurance Co.,* 370 Pa.Super. 51, 535 A.2d 1145 (1988), *alloc. denied,* 520 Pa. 590, 551 A.2d 216 (1988). *Wolgemuth* held that the vehicle for which a policy was issued could not be the underinsured vehicle for purposes of determining entitlement to underinsured benefits under that policy. Accord: *Little v. United States Fidelity and Guaranty Co.,* No. 88–1320, slip op. at 5 (W.D.Pa. May 17, 1989).

### D. *Estoppel*

■ Finally, we reject the district court's estoppel rationale. There is an insufficient basis for a finding of estoppel. A finding could, arguably, be based either on Nationwide's acceptance of a premium from Baldwin, as the district court found, or on representations allegedly made by Baldwin's insurance broker, Margaret R. Smith, as Baldwin now urges us to find. Nationwide's acceptance of the premium does not advance Baldwin's cause. Nationwide accepted the premium in exchange for extending "occasional driver" coverage to Budd, and, as discussed above, that status

---

**9.** These impressions are reinforced by Baldwin's deposition testimony (36a). When asked why Budd was listed on her policy, she testified:
A. "That's just the way it was when he turned 16. I don't know why, other than he was driving a Mustang that was listed in my name. And I went to Peggy [ ] and said we need to add David to an insurance policy, and David was put on my policy." 35a–36a
Q. But I'm talking about up until—
A. Yes. We just never changed it.
Q. Never changed it?
A. Never changed it. He probably would have changed it when he got married in September.
Q. Why?

MR. WHEELER: Because he would have bought a car in his own name.
A. He would have been living in New Jersey and wouldn't have reason to commute. Until he got married, he was living up here on the weekends, he was living down the shore during the week. He was going to change everything whether (sic) when he and Alicia got married, and then it would have been jointly.
Also significant is the fact that Budd's estate is being probated in Cape May County, New Jersey pursuant to Letters of Administration issued May 4, 1990 to Anne Marie Budd–Baldwin.

does not entitle him to benefits under the facts presented.

■ Second, we reject Baldwin's argument based on alleged representations by Smith, because she has not directed our attention to any specific representations made by Smith which indicate that she promised availability of first party or underinsured benefits under the circumstances here. The statements which Baldwin argues support her position establish nothing more than an assurance by Smith that Budd had coverage, which in fact he had, as an occasional driver. Additionally, there has been no specific showing that Smith was made aware of Budd's 1989 residency status, i.e. that he lived principally in New Jersey and visited Baldwin only on weekends. When asked whether she was aware of Budd's 1989 residency status, Smith equivocated. At one point she testified:

> Q. You were questioned by the investigator: Question, did you know that David had moved to the Villas, New Jersey? And your answer was I did not know that he had moved to New Jersey on a permanent basis. What I understood was that he was at the shore during the week on business and on business with his brother. He would come religiously every weekend to his sister's residence or his brother's residence, depending on whether it was to see his fiancee, Elisha DeCarlo. Now, is that an accurate transcription of what you said at that time?
>
> A. Yes, it is.

(M. Smith deposition, p. 3b) [10] This testimony suggests that she was aware that Budd worked in New Jersey and lived there five days a week but that she had a somewhat inaccurate understanding of the situation and viewed the time he spent there as business trips. Smith testified at another point that she assumed Budd continued to reside with his sister:

> THE WITNESS: It was my assumption that David—David's residency was with his sister. As a driver—as a licensed driver in the State of Pennsylvania, I must name him on a policy.

(M. Smith deposition, p. 2b) When asked about conversations she may have had about Budd's residency during the late summer/fall of 1989, Smith testified:

> Q. Did you have it with anybody else during the period August, September, October, November of 1989?
>
> A. Probably with his brother Michael.
>
> A. And what did his brother Michael tell you?
>
> A. I cannot be sure but I believe that Michael and—that Michael was having David stay at his home and—my understanding of where David's residency was, was between his brother and his sister in the State of Pennsylvania.
>
> Q. And when you say his brother and his sister you're talking about his brother Michael?
>
> A. Yes, I am.
>
> Q. And his sister Anne Marie?
>
> A. That's correct.
>
> Q. And what was your basis for that information, Miss Smith as to where David was living?
>
> A. I didn't have any information that was counter to that.
>
> Q. Well, okay, I understand that. But you must have had some information or some source of information on which to base that understanding as to where he was living, and what I'm trying to find out what that was?
>
> A. I cannot recollect.

(M. Smith deposition, p. 38a) Smith also testified that had she been aware of his

---

**10.** This testimony is consistent with Baldwin's. She testified:

> A. ....I know I had a conversation with her [Margaret Smith] sometime in September or October, before David died. I had stopped in to pay a premium and I was adding—it was probably in September. I was adding homeowners onto my insurance policy, and at that

point we went over my insurance again to put me on a payment plan.

> Q. Did she ask where David was living?
>
> A. She knew David was at the shore, she asked me how he was doing, how his house was doing, she just saw him and Alicia, you know, how are the wedding plans coming.

(A. Baldwin deposition, p. 7b)

true residency status, she would not have placed him on the policy as a named driver. In response to a question from Attorney Liero, she testified:

Q. If you knew at some point that David was living full time in New Jersey at his own house or someone else's house, would you still be able to insure him under the Nationwide Policy issued to Anne Marie Budd Baldwin?

THE WITNESS: As a named driver?

MR. LIERO: As a named driver.

THE WITNESS: I would have no reason to do that.

(M. Smith deposition, p. 1b)

█ Baldwin, as plaintiff, bears the burden of proving entitlement to benefits under an estoppel theory and of demonstrating at summary judgment stage, that she has marshalled the facts necessary to support recovery on this theory. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986) and *Celotex v. Catrett,* 477 U.S. 317, 323–24, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). Although Smith testified that she knew that Budd spent much of his time in New Jersey, she stated that she thought he went there only for business purposes. This does not constitute evidence that Smith knew that Budd was residing in his own home in New Jersey, and the absence of such evidence warrants summary judgment in Nationwide's favor on this issue.

For these reasons, we will reverse the summary judgment entered by the district court and will remand for it to grant summary judgment in favor of Nationwide. *Beck v. Reliance Steel Products Co.,* 860 F.2d 576, 581 (3d Cir.1988). Baldwin's cross motion to compel arbitration, which was filed before the district court but not ruled on, is moot.