**STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY, Appellant,**

v.

**Stewart L. QUINN and Karen Quinn husband and wife.**

**No. 02–2250.**

United States Court of Appeals, Third Circuit.

Submitted under Third Circuit L.A.R. 34.1(a) Jan. 13, 2003.

Decided Jan. 29, 2003.

Moses' store. Therefore, there is no merit to the suggestion that Smith's criminal record was overstated.

Frank M. Gianola, James M. Girman, Angela R. Winslow, Dickie, McCamey & Chilcote, P.C., Pittsburgh, PA, for Appellants.

Laurence B. Green, Berger & Green, Pittsburgh, PA, for Appellees.

Before SCIRICA, BARRY, and SMITH, Circuit Judges.

OPINION OF THE COURT

PER CURIAM.

Plaintiff-appellant State Farm Mutual Insurance Company ("State Farm") brings this appeal, challenging the District Court's failure to grant the plaintiff's Motion for Judgment as a Matter of Law as well as the District Court's final judgment in favor of defendants, Stewart L. Quinn and Karen Quinn. Federal jurisdiction over the subject matter of this dispute exists pursuant to 28 U.S.C. § 1332. We have appellate jurisdiction pursuant to 28 U.S.C. § 1291.

"Our review of the district court's granting of a directed verdict is plenary; we engage in the same inquiry as the district court in deciding the motion." *St. Paul Fire & Marine Ins. Co. v. Lewis,* 935 F.2d 1428, 1431 (3d Cir.1991) (citing *Gay v. Petsock,* 917 F.2d 768, 771 (3d Cir.1990)). "A directed verdict is appropriate only where the evidence, when viewed in a light most favorable to the party opposing the motion, is insufficient for a reasonable jury to find in favor of the opposing party." *Id.* Because we conclude that the evidence in the record before the District Court was insufficient as a matter of law to demonstrate that Nicholas Quinn "live[d] with" Stewart Quinn in Pennsylvania at the time of his death, we will reverse the Order of the District Court and remand with instructions that the District Court enter an order granting declaratory judgment to the plaintiff, State Farm.

## I.

On May 9, 1999, Nicholas Quinn, the minor, biological son of Stewart Quinn and Cynthia Rideout, was killed in a motor vehicle accident in Boulder City, Nevada. At the time of his fatal accident, Nicholas was fifteen years of age and living with his mother, Cynthia Rideout, and step-father,

Reginald Rideout, in Boulder City, Nevada. Stewart Quinn then resided with his wife, Karen Quinn, in Georgetown, Pennsylvania.

Nicholas Quinn was born in Pennsylvania. His biological parents, Stewart and Cynthia, never married, although they lived together, with Nicholas, until the decedent was approximately two and one-half years old. The couple separated in 1985, and has lived apart ever since. Nicholas continued to live with his mother, and moved with Cynthia to Boulder City, Nevada, when she relocated there in 1987. Cynthia later married Reginald Rideout.

After moving from Pennsylvania, Nicholas did not visit or see his father, who resided in Pennsylvania, until the summer of 1997, when Nicholas was thirteen. That summer, he visited his father and his father's family for two months. Nicholas again visited his father the following summer of 1998 for about six weeks.[1] At the time of his accident in May, 1999, Nicholas was living with his mother and stepfather in Nevada, and had not seen his father in eight months. However, Mr. Quinn asserted at trial that Nicholas intended to move to Pennsylvania and live with his father permanently after the conclusion of that school year.

The litigation below arose when, after Nicholas's accident in Nevada in May 1999, Stewart Quinn filed an underinsured motorist claim in Pennsylvania, under his wife Karen's State Farm insurance policy, to obtain compensation for the death of his son. Cynthia Rideout, who also possessed a State Farm insurance policy, had also filed such a claim. After investigating the respective claims of Mr. Quinn and Mrs. Rideout, State Farm paid in its entirety the claim of Cynthia Rideout in Nevada, but denied Stewart Quinn's claim. By its terms, Karen Quinn's insurance policy covered the insured and her "relatives." That term was defined as follows:

> Relative—as used in Sections I, III, IV and V means a person related to you or your spouse by blood, marriage or adoption, who lives with you. It includes your unmarried and unemancipated child away at school.

Based on its investigation, State Farm concluded that Nicholas did not "live[ ] with" Stewart and Karen in Pennsylvania at the time of his death and was not covered by the Quinn's policy. Therefore, State Farm brought this action seeking a declaratory judgment that Nicholas was not covered by the Quinn's insurance policy.

At trial, State Farm argued that Nicholas's two visits with Stewart Quinn in the two summers preceding his death were insufficient, as a matter of law, to demonstrate that Nicholas "live[d] with" Stewart Quinn, as that term is used in the Quinn's insurance policy. State Farm proved that Cynthia Rideout had sole custody of Nicholas in Boulder City, Nevada. Stewart Quinn testified that Nicholas never received any mail at his residence, was not listed as a dependent under his health insurance, or claimed as a dependent on the Quinns' tax returns. State Farm also presented testimony that, on September 21, 1998—about a month after Nicholas's final visit to Stewart and Karen—Karen Quinn filled out the application for the

---

1. The length of Nicholas's visits with his father in the summers of 1997 and 1998 was disputed before the District Court. Cynthia Rideout testified that the 1997 visit was for one week, while the 1998 visit was for two to three weeks. The pastor of defendant Stewart Quinn's church testified that Nicholas lived with his father for approximately one month in 1998. Viewing the evidence in the light most favorable to the non-movant, we will assume that Stewart Quinn's version of the events is correct.

insurance policy at issue. At the time, Nicholas was fourteen, about to turn fifteen. One question on the application Karen Quinn filled out asked, "Are there household members age thirteen or older who are not yet licensed? And it was checked no." App. 60 (testimony of Terri McElhinny, State Farm insurance agent). Another question asked "whether there is a child away at school?" App. 61. That box was checked no. *Id.*

Stewart Quinn testified at trial that Nicholas had been living with both parents, spending the school year with his mother Cynthia Rideout in Boulder City, and living with his father Stewart Quinn during the summer months. Mr. Quinn asserted that he provided regular and up to date financial support for Nicholas, spoke with Nicholas weekly, as did his half siblings, sent cards and gifts for holidays and birthdays, and kept Nicholas's clothing, baseball card collection, bat, glove, and fishing gear at his home in Pennsylvania for use by Nicholas in the summer months.

At the Charge Conference, the parties stipulated that the sole issue for the jury to decide was whether or not Nicholas Quinn lived with his father, as that term was used in the Quinn's State Farm insurance policy. However, appellant State Farm alleges that the District Court confused this issue and misled the jury through the charge ultimately given to the jury. The District Court asked the jury whether "the decedent, Nicholas Quinn, lived with his father, defendant Stewart Quinn," but State Farm alleges that this did not clearly establish the critical issue of where Nicholas lived "at [the] time of his death." State Farm also alleges that

the District Court confused the jury with discussions of Pennsylvania law, which provides that a child of separated or divorced parents can be regarded as a "resident" of the households of both parents. Whether a child is a "resident" of a household under Pennsylvania law does not answer the question of whether a child "lives with" a parent, as a matter of contractual interpretation. Finally, State Farm alleges that the District Court erred in certain evidentiary rulings which were unfairly prejudicial, or were irrelevant and confusing to the jury.

Because we conclude that the evidence before the District Court was insufficient as a matter of law to prove that Nicholas "live[d] with" Stewart Quinn, we reverse on that ground. We need not reach the other issues raised by the appellant as they are mooted by our decision that the plaintiff is entitled to the entry of judgment in its favor.

## II.

When "construing an insurance policy, unambiguous terms are to be given their 'plain and ordinary meaning.'" *St. Paul Fire & Marine*, 935 F.2d at 1431 (quoting *Pennsylvania Mfrs. Ass'n Ins. Co. v. Aetna Casualty & Sur. Ins. Co.*, 426 Pa. 453, 233 A.2d 548, 551 (Pa.1967)). "Determining whether the terms of a contract are ambiguous is a question of law." *Id.* (citing *Int'l Union, UAW v. Mack Trucks, Inc.*, 917 F.2d 107, 111 (3d Cir.1990)).[2]

In *St. Paul Fire & Marine*, this Court had an opportunity to construe an insurance policy with similar wording and context as the insurance policy at issue here. *See St. Paul Fire & Marine*, 935 F.2d at 1430 (construing insurance policy language

2. As this Court has done on prior occasions, where, as here, the "district court applied Pennsylvania law and neither party challenges this choice of law on appeal ... we assume the court made this choice under Pennsylvania's choice of law rule requiring application of the law of the state with the greatest interest in the litigation." *See St. Paul Fire & Marine*, 935 F.2d at 1431 n. 3.

stating that "we'll cover all relatives living with you and anyone under 21 in your or their care"). That case likewise concerned the attempt of a father to recover on his personal automobile insurance policy after an accident that resulted in the death of his son. Because we concluded that the evidence presented, even when viewed in the light most favorable to the father, was insufficient to demonstrate that the son was "living with" the father, we affirmed the District Court's grant of directed verdict. *Id.* at 1433.

The language of the policy at issue here, "lives with," is substantially the same as the language that was at issue in *St. Paul Fire & Marine,* "living with." *Id.* at 1430. Therefore, we will adopt that same reasoning for the analysis of this case. Noting that neither party contends that this nearly identical phrase is "ambiguous" under Pennsylvania law, we will assume that, like the contract in *St. Paul Fire & Marine,* "this insurance contract is not ambiguous." *Id.* at 1431.

In construing the policy in *St. Paul Fire & Marine,* this Court reasoned "that no reasonable jury could have found that the phrase [living with] does not require at least some regular, personal contacts with the insured's home." *Id.* at 1431. The "concept of living with someone contemplates, at a minimum, some consistent, personal contact with the person's home. Occasional, sporadic, and temporary contacts are insufficient." *Id.* at 1431–32.

Furthermore, we found implicit in that phrase a requirement that "a party must live with the insured *at the time of the accident,* we cannot interpret it to mean otherwise." *See id.* at 1433 (emphasis added). This was because any other interpretation would lead to an unreasonable result. If we were to interpret it as meaning that a party need only live with the insured at some point during the policy period, we should give in-

sureds the ability to affect the scope of their policies ... We decline to adopt an interpretation that would lead to [such an] unreasonable result which could not have been intended by either Leonard Klinghoffer or St. Paul. *See Tennant v. Hartford Steam Boiler Inspection & Ins. Co.,* 351 Pa. 102, 40 A.2d 385, 387 (1944) ("A contract of insurance must have a reasonable interpretation such as was probably in the contemplation of the parties when it was made.").

*Id.*

In reaching our conclusion in *St. Paul Fire & Marine,* we relied upon the Pennsylvania Superior Court's decision in *Amica Mut. Ins. Co. v. Donegal Mut. Ins. Co.,* 376 Pa.Super. 109, 545 A.2d 343 (1988), as support. *See St. Paul Fire & Marine,* 935 F.2d at 1432. In *Amica,* the Pennsylvania Superior Court considered, for purposes of insurance coverage, whether an eighteen year old daughter of divorced parents was a resident of her father's home. That Court adopted the view that "residence" is "a matter of physical fact." *Amica,* 545 A.2d at 346. It considered, but rejected, arguments that the child was a resident of both parents' homes, reasoning that because the daughter "did not spend a significant and scheduled amount of time at her father's home," she did not reside with her father, in addition to her mother. *Id.* at 349. The fact that the daughter had possessions at her father's house was not considered important. "Rather, it lends support to the conclusion that she *had* lived there and that she *intended* to live there again. These considerations, however, are not pertinent to the present issue [of where she lives now]." *Id.* (emphasis original).

While the evidence before the District Court did indicate that there was past "personal contact" between Nicholas and Stewart Quinn's home, that contact was not "consistent." *See St. Paul Fire &*

*Marine,* 935 F.2d at 1431. It is true that Nicholas visited Stewart for two *consecutive* summers, and evidently planned to return again that upcoming summer. However, these two visits—amounting to, at most, fourteen weeks out of the last twelve years of Nicholas's life—were insufficient to establish a *consistent* habit of contact with Stewart Quinn's home. The record also shows that they were not "scheduled" visits. *See Amica,* 545 A.2d at 349. In each instance that Nicholas visited Stewart, Stewart Quinn's testimony indicates that the visits were products of an individual agreement and negotiation between Stewart and Cynthia. We therefore conclude that these two visits only amounted to "[o]ccasional, sporadic, and temporary contacts" with appellee's home. *See St. Paul Fire & Marine,* 935 F.2d at 1432.

Granting that Nicholas intended to live at his father's home in the future, the evidence presented to the jury did not show that he was living there "at the time of the accident." *See id.* at 1433; *see also Amica,* 545 A.2d at 345–46. We believe that, under this policy, where a child lives is primarily "a matter of physical fact and not intention." *See Amica,* 545 A.2d at 346. Besides some isolated personal effects and the occasional past visit, there was nothing that physically linked Nicholas to Stewart Quinn's home on May 9, 1999. There was no joint custody of Nicholas by Stewart, no visitation agreement that provided Nicholas with regular and consistent contact to Stewart's home, and no insurance contracts naming Nicholas as a beneficiary. Furthermore, Pennsylvania case law indicates that Nicholas's future intent is "not pertinent" to the issue of where Nicholas lived at the time of the accident. *See Amica,* 545 A.2d at 349.

### III.

The record before the District Court showed that Nicholas Quinn was physically living with his mother in Nevada at the time of his fatal accident, in Nevada, in May 1999. Therefore, in the absence of an established habit of regularly scheduled and consistent physical contact between Nicholas and Stewart Quinn's home in Pennsylvania, this question should not have been submitted to the jury merely because "there is evidence that could be interpreted as showing that he was living with [the Quinns] at other points during the policy period." *St. Paul Fire & Marine,* 935 F.2d at 1433 (rejecting such an argument). The evidence before the jury was insufficient to prove the existence of such consistent, personal contacts between Nicholas and Stewart Quinn's home in Pennsylvania at the time of the accident. We will reverse the Order of the District Court and remand with instructions that the District Court enter judgment as a matter of law for the appellant State Farm.