### WALL ROSE MUTUAL INSURANCE COMPANY,

v.

**Esther MANROSS, Allen J. Darr, Tyler Darr, Anthony Cafaro, A Minor by and through Shari Cafaro, Parent and Natural Guardian and Shari Cafaro, Individually**

**Appeal of Anthony Cafaro, A Minor by and through Shari Cafaro, as Parent and Natural Guardian and Shari Cafaro, Individually.**

Superior Court of Pennsylvania.

Argued May 22, 2007.

Filed Dec. 21, 2007.

---

Christopher Michael Miller, Pittsburgh, for appellant.

William C. Wagner, Erie, for appellee.

BEFORE: HUDOCK, TODD and TAMILIA, JJ.

OPINION BY HUDOCK, J.:

¶ 1 In this declaratory judgment action, Anthony Cafaro, a minor, by and through Shari Cafaro, as parent and natural guardian, and Shari Cafaro, individually (collectively, "the Cafaros"), appeal entry of summary judgment in favor of Wall Rose Mutual Insurance Company (hereinafter "Wall Rose"). We affirm.

¶ 2 The trial court has ably summarized the pertinent facts and procedural history of this action as follows:

[Wall Rose requested] summary judgment in this declaratory judgment action, which [sought] a determination as to whether Allen J. Darr (hereinafter "A.J. Darr") is an "insured" under the homeowner's policy issued by [Wall Rose] to Esther Manross, [A.J. Darr's grandmother,] in regard to the incident that occurred on June 14, 2004 at the Manross' home. [Wall Rose's] Motion for Summary Judgment is based on its assertion that A.J. Darr was not living at the Manross residence on June 14, 2004 and consequently does not qualify as an "insured" under the homeowner's policy. [The Cafaros] have filed their own Motion for Summary Judgment in which they contend that the Manross household was in fact A.J.'s residence on June 14, 2004. The Cafaros are the plaintiffs in two other actions, filed at A.D.2005–519 and A.D.2004–544, from which stems the present action for declaratory judgment.

The events giving rise to this action occurred on June 14, 2004 at the home of Esther Manross. This much [is] undisputed. Although it also appears undisputed that Anthony Cafaro was injured while visiting the Manross residence by an ornamental dagger, which struck his left leg, the specifics as to how the injury occurred are at odds in the various pleadings and motions filed by the parties. [In the briefs on appeal, the parties appear to agree that the stabbing was accidental.] However, how the incident occurred does not bear on the issue [to be decided]. Due to the two pending actions that followed the incident on June 14, 2004, [Wall Rose sought] a determination through this declaratory judgment action as to whether A.J. Darr qualifies as an "insured" under the homeowners insurance policy issued by [Wall Rose to Esther Manross].

Trial Court Opinion, 10/3/06, at 1–2. The trial court denied the Cafaros' motion and entered summary judgment in favor of Wall Rose, holding that A.J. "was not a resident of any household" but, rather, was "a vagabond", who "drifted from place to place to suit his needs at that moment in time." *Id.* at 6–7. Accordingly, A.J. Darr was not considered an "insured" under the terms of the policy. The Cafaros timely appealed, and they now ask this Court to consider the following:

1. Whether the Trial Court erred when it did not specifically find that the Wall Rose definition of an insured as "resident relative" was ambiguous and thereafter interpreting the ambiguous policy language against Wall Rose as the writer of the policy and finding that the Esther Manross home was one of A.J. Darr's residences[?]

2. Whether the Trial Court erred in failing to decide that there were genuine issues of material fact in dispute and that reasonable minds could differ as to the issue of A.J. Darr's residency therefore denying

both parties['] motions for Summary Judgment and submitting this case to a jury to decide the factual issues in dispute?

The Cafaros' Brief at 4.

■■■ ¶ 3 Our scope of review is plenary when considering an order granting summary judgment pursuant to a declaratory judgment action. *Kvaerner Metals Division of Kvaerner U.S., Inc. v. Commercial Union Insurance Company,* 589 Pa. 317, 908 A.2d 888, 895 (2006). We will reverse the order of the trial court only if we find that an error of law or an abuse of discretion has occurred. *Id.* An abuse of discretion is not merely an error of judgment. *Paden v. Baker Concrete Construction, Inc.,* 540 Pa. 409, 658 A.2d 341, 343 (1995). Furthermore, it is insufficient to persuade the appellate court that it might have reached a different conclusion if, in the first place, charged with the duty imposed on the trial court below. *Id.*

> An abuse of discretion exists when the trial court has rendered a judgment that is manifestly unreasonable, arbitrary, or capricious, has failed to apply the law, or was motivated by partiality, prejudice, bias, or ill will. Where the record adequately supports the trial court's reasons and factual basis, the court did not abuse its discretion.

*Harman v. Borah,* 562 Pa. 455, 756 A.2d 1116, 1123 (2000) (citations omitted).

■■■ ¶ 4 Summary judgment is proper only when the pleadings, depositions, answers to interrogatories, admissions and affidavits and other materials demonstrate that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *Blumenstock v. Gibson,* 811 A.2d 1029, 1033 (Pa.Super.2002), *appeal denied,* 573 Pa. 714, 828 A.2d 349 (2003). The reviewing court must view the record in the light most favorable to the nonmoving party and resolve all doubts as to the existence of a genuine issue of material fact against the moving party. *Kvaerner,* 908 A.2d at 895–96. Only when the facts are so clear that reasonable minds could not differ can a trial court properly enter summary judgment. *Id.* at 896.

■■■ ¶ 5 Moreover, a policy of insurance is a contract, and the interpretation of a contract is a question of law for which our standard of review is *de novo. General Refractories Company v. Insurance Company of North America,* 906 A.2d 610, 612 (Pa.Super.2006). When construing the written contract that embodies the terms of a policy of insurance, courts must look to the intent of the parties as expressed in the writing itself. *Id.* When the words of the insurance policy are clear and unambiguous, the intent is to be gleaned exclusively from the explicit language of the agreement. *Id.* The focus of any such interpretation is upon the terms of the agreement as **manifestly expressed,** rather than as, perhaps, silently intended. *Id.* Words of "common usage" in an insurance policy are to be construed in their natural, plain, and ordinary sense, and a court may inform its understanding of these terms by considering their dictionary definitions. *Id.* Moreover, courts must construe the terms of an insurance policy as written and may not modify the plain meaning of the words under the guise of "interpreting" the policy. *Id.* If the terms of a policy are clear, this Court cannot rewrite it or give it a construction in conflict with the accepted and plain meaning of the language used. *Id.*

■■■ ¶ 6 When an insurer relies on a policy exclusion as the basis for its denial of coverage and refusal to defend, the insurer has asserted an affirmative defense and, accordingly, bears the burden of proving such a defense. *Wilcha v. Nationwide*

*Mutual Fire Insurance Company,* 887 A.2d 1254, 1258 (Pa.Super.2005). To determine whether the insurer has met its burden of proof, we rely on well-settled principles of contract interpretation. *Id.* When a provision of a policy of insurance is ambiguous, the policy provision is to be construed in favor of the insured and against the insurer. *Prudential Property and Casualty Insurance Company v. Sartno,* 588 Pa. 205, 903 A.2d 1170, 1174 (2006). The insurance company, being the one who selects the language in the contract, must be specific in its use. *Id.* at 1177. An exclusion from liability must be clear and exact and unambiguous in order to be given effect. *Id.* Describing the "hallmarks of ambiguity," the Supreme Court explained that:

> Contractual language is ambiguous if it is reasonably susceptible of different constructions and capable of being understood in more than one sense. This is not a question to be resolved in a vacuum. Rather, contractual terms are ambiguous if they are subject to more than one reasonable interpretation when applied to a particular set of facts.

*Id.* (citations and quotations omitted). Thus, if we find an exclusionary clause to be ambiguous, we construe it in favor of the insured. *Id.* But if the language is not ambiguous, we must enforce the exclusion. *Id.*

¶ 7 Under the policy of insurance at issue in this case, the term "insured" is defined as follows:

  a. "you";
  b. "your" relatives if residents of "your" household;
  c. Persons under the age of 21 residing in "your" household and in "your" care or in the care of "your" resident relatives; and
  d. "your" legal representative, if "you" die while insured by this policy ...

Policy, Exhibit "A" to Complaint for Declaratory Judgment, at 2–3. As it is undisputed that A.J. Darr is a "relative" of his grandmother, Esther Manross, and was twenty-one years of age at the time of the incident, the determinative issue is whether he was a "resident" of her household, as per the terms of section b above. The Cafaros, in their first issue, contend that the "resident relative" language has been held by the appellate courts to be ambiguous and as such should be interpreted in favor of providing coverage. Specifically, they argue that the evidence presented through the numerous depositions suggests that A.J. Darr had multiple residences, the primary of which was that of his grandmother. Thus, the Cafaros assert that, because the language of the policy does not limit a person to one residence, and because Esther Manross's home was one of the places that A.J. Darr stayed often, returned to and considered as his primary residence, coverage should be extended to him as an "insured." In their second issue, the Cafaros submit that not only was there more than sufficient evidence in the record that reasonable minds could conclude that A.J. Darr was a resident of the Manross household, but that, "at the very least, there were conflicts in the testimony that raised a genuine issue of material fact as to [his] residency at the time of the stabbing incident." The Cafaros' Brief at 7.

¶ 8 The trial court, in determining that A.J. Darr was not a resident of the Manross household, reasoned:

> A.J. admitted at his deposition that after his mother's move sometime in early 2004, he decided to stay with his grandmother for a short time and then move in with his friend, Chad McClain. A.J. did stay at the Manross household briefly following his mother's move and then moved to McClain's home, where

he stayed for a period of up to two months prior to the incident. At the time the incident occurred, A.J. was in fact still staying overnight at the McClain residence, sleeping on the McClain's couch. While living at McClain's, A.J. returned to his grandmother's home to launder his clothes and to visit his brother Tyler.

A.J. did not have a key to the Manross home and slept on a couch when he stayed there, except for one occasion when he slept in his brother, Tyler Darr's room. The bedrooms of the Manross home were in fact occupied by other relatives around the time of the June 14, 2004 incident, with A.J.'s brother occupying the attic and his sister and her husband occupying a bedroom. Unlike these relatives, A.J. had no room in the house. While A.J. offered to pay rent to Chad McClain, he never offered to pay rent to Esther Manross. A.J. possessed an ID card issued by the Commonwealth of Pennsylvania, which in 2004 listed his mother's address. A.J. never had an ID card with his grandmother's address. While A.J. received some mail at his grandmother's home, this appears to have been on-going since he was a young child, with the recent addition of some medical bills.

A.J.'s belongings appeared to be minimal and while he kept a few things at the Manross home, such as a toothbrush and some clothing, at the time of the incident, his VCR and some items of clothing were at Chad McClain's and his radio was at the home of another friend. The clothing A.J. kept at his grandmother's home was stored in his grandmother's bedroom in a dresser where Esther Manross kept clothing for her various grandchildren. Moreover, various friends of Tyler Darr also kept items of clothing at the Manross household. While A.J. referred to the Manross residence as his home, his presence at the residence on June 14, 2004 was in order "to visit for a little while and see [his brother]."

* * *

A.J. does not appear to have had any factual place of abode at the time of the incident. He certainly did not have it at the home of his grandmother, Esther Manross. He had no key to the house; no room to call his own; no bed and he wasn't even sleeping at [the Manross] house at the time of the incident, but rather was staying at his friend McClain's house. A.J. slept on the couch, which is in contrast to other family members who actually lived at the Manross residence. What clothes he kept at his grandmother's were kept in her bedroom. His erratic visits did not demonstrate a purpose to be a part of and reside at the Manross household. He may have been welcome there, but the reception was more in the vein of a houseguest than a member of the household.

Trial Court Opinion, 10/3/06, at 4–5 and 6.

¶ 9 The salient question in addressing Appellant's claims, and in determining whether the trial court abused its discretion, is what constitutes residency for purposes of coverage under the insurance policy. Although the term "resident" is not defined in the policy, we do not find it to be ambiguous. We find guidance in the recent case of *Erie Insurance Exchange v. Weryha*, 2007 PA Super 247, 931 A.2d 739. In *Weryha*, appellants, parents of a son who was struck and killed by a car while attempting to cross the road in front of the marital residence, sought review of a grant of summary judgment in favor of the insurance company in a declaratory judgment action. The trial court concluded that their child did not reside with the

father at the time of the accident, as the appellants were separated at the time of the accident and, therefore, was not covered under the father's policy for purposes of underinsured motorist coverage. The policy defined the term resident as "one who 'physically lives' in the insured's household." *Id.* at ¶ 11. In determining what constitutes "physically living" with another we stated, "[t]he question of whether one physically lives with another is a factually intensive inquiry and it requires the trial court to look at a host of factors in reaching a common-sense judgment." *Id.* at ¶ 12. Thus, we did "not find ambiguity in the phrase 'physically lives' simply because the policy does not spell out every single factor a court should look at in making this determination." *Id.* Similarly, in the present case, we do not find the term "resident" ambiguous merely because it is not defined in the policy. Rather, in such a situation, we apply the common law definition historically used by the courts of this Commonwealth and apply it to the facts of the case, with the court, similar to the court in *Weryha,* examining various factors to arrive at a common-sense decision. *See Amica Mutual Insurance Company v. Donegal Mutual Insurance Company,* 376 Pa.Super. 109, 545 A.2d 343, 346 (1988) (applying common law definition of "resident" in absence of policy definition). In *In re Residence Hearing Before the Board of School Directors, Cumberland Valley School District,* 560 Pa. 366, 744 A.2d 1272 (2000), our Supreme Court approved the "classic" definitions set forth by this Court in *Amica, supra,* and its progeny:

"The courts of this Commonwealth have historically recognized the classic definitions of the words domicile and residence." *Norman v. Pennsylvania National Ins. Co.,* [453 Pa.Super. 569, 574], 684 A.2d 189, 191 (1996), quoting *Amica Mutual Ins. Co. v. Donegal Mutual Ins. Co.,* 376 Pa.Super. 109, 115, 545 A.2d 343, 346 (1988). "Domicile [is] that place where [people have their] true, fixed and permanent home and principal establishment, and to which whenever [they are] absent [they have] the intention of returning." *Id.* "Residence," in contrast, is "a factual place of abode" evidenced by a person's physical presence in a particular place. *Id.*

*In re Residence Hearing,* 744 A.2d at 1275 (alterations in original); *see also In re Lesker,* 377 Pa. 411, 105 A.2d 376, 380 (1954) ("in strict technical terminology a *habitation* may be defined as an abode for the moment, *residence* a tarrying place for some specific purpose of business or pleasure, and *domicile* the fixed, permanent, final home to which one always intends to return") (quoted in *In re Residence Hearing).* Though the words domicile and residence "may be used in the same context, the word resident as used in the policy, without additional words of refinement, i.e., permanent, legal, etc., would carry the more transitory meaning." *Amica,* 545 A.2d at 346 (quoting *Krager v. Foremost Ins. Co.,* 304 Pa.Super. 390, 450 A.2d 736, 738 (1982)). Nonetheless, the term "resident" or "residency" requires, "at the minimum, some measure of permanency or habitual repetition." *Weryha,* 2007 PA Super 247, ¶ 20, 931 A.2d 739. Also, "[s]ince resident status is a question of physical fact," intention is not a relevant consideration. *Amica,* 545 A.2d at 348.

¶ 10 The facts of this case fall somewhere within the spectrum of cases interpreting the term resident. In *Amica, supra,* a daughter of divorced parents sought to obtain coverage for an automobile accident under her father's auto insurance policy, which provided coverage for relatives who were residents of his household. At the time of the accident, the daughter had been living at her mother's house, making

"sporadic" visits to her father's house, but the trial court concluded that she did not spend a substantial amount of time at his house. *Amica*, 545 A.2d at 345. She did have, however, "a closet or two full of clothes at her father's house, approximately forty pairs of shoes, books, cosmetics, stuffed animals, tennis equipment, and a pet rabbit. She received mail there as well." *Id.* at 345. Also, although the accident interrupted her plans, she planned to spend that month following graduation living at her father's house prior to her departure to college. *Id.*

¶ 11 After reviewing the case law discussed above, we concluded that the common law definition of "resident" was applicable to the policy in question:

The policy provides coverage for family members of the insured who are residents of his household. This language contains no words of refinement, such as "legal" or "permanent" which might suggest a less transitory meaning. Rather, we construe the language to limit coverage to those who actually reside in the household of the insured.

*Id.* at 346. We agreed with the trial court that, as "a matter of physical fact," the daughter resided in her mother's house at the time of the accident and noted that "the personal items which Elizabeth kept at her father's house at the time she lived with her mother were for convenience and did not evidence that she physically lived there." *Id.* at 346. Accordingly, we affirmed the trial court's conclusion that the daughter was not a resident of her father's household for purposes of the insurance policy.

¶ 12 In *Norman v. Pennsylvania National Insurance Company*, 453 Pa.Super. 569, 684 A.2d 189 (1996), we again addressed similar policy language. There, the appellant was injured in an automobile driven by Scott Clever, and he sought insurance coverage under policies with Clever's stepfather and Clever's grandfather, asserting that Clever was a resident relative in one or both of those households. We recounted the facts as follows:

Clever's residence and living arrangements, from the time of high school graduation in 1985 until the time of the accident were established by way of deposition testimony. After graduation, Clever moved from the Butz's home to Erie, Pennsylvania, where he stayed for approximately one year. He subsequently lived with his brother for a few months in Brookville, Pennsylvania. He also lived in his girlfriend's home for a few months. Clever later moved in with his grandparents, the Runyans, in February or March of 1987. Clever relocated to DuBois, Pennsylvania, in August of 1987, where he found a job at McDonald's. While in DuBois, Clever lived with friends in an apartment. On November 1, 1987, Clever moved out of DuBois because he had enlisted in the Marines and was scheduled to report for duty on December 7, 1987 [two days after the accident]. Clever decided to spend the month visiting friends and family before leaving for the Marines. During a deposition, Clever described his activities as follows: "Well, I was going to jump around and visit everybody, you know, till I left. As far as when I come back from DuBois, I put my clothes and everything at my mom's, but I wasn't going to take up residency or anything." When asked how much time Clever spent at his mother's/stepfather's residence between November 1st and December 7th, he replied: "Probably at the most I would say a week and a half I was there. Other times I was like down staying at my grandparents and visiting my cousins and stuff." Clever admitted to staying at least five

different places during the period between November 1st and the December 7th accident. Gloria Butz, Clever's mother, testified in her deposition that Clever had been staying with her for a few days before the accident. She also testified that, prior to the accident, if mail came to her home addressed to Clever, she would write "not at this address" on it and place it back in the mail box. Willard Butz also testified that Clever stayed at the Butz's home for three or four days prior to the accident. *Id.* at 190. Relying heavily on *Amica, supra,* we determined that Clever was not a resident of either home:

> [W]hile we acknowledge that the term "resident" has a more transitory meaning when it contains no qualifying terms of refinement, we nevertheless find that the trial court was correct in concluding that Clever was not a "resident" at the Butz's or the Runyan's at the time of the accident. Clever cannot be said to have actually resided in the household of either insured. *Amica, supra.* The undisputed facts reveal that, since Clever moved from the Butz home one year after graduation, his visits with his mother and stepfather have been sporadic at best. Clever's mother admitted that she would return any mail that was delivered to Clever at her address. During the month preceding the acci-

dent, Clever resided with the Butzes for, at the most, several days. The few belongings Clever brought to the Butz house did not evidence that he physically lived there for purposes of insurance coverage. *Amica, supra.* Clever's connection to his grandparents' home is even more tenuous; he admits to this fact in his appellate brief. Clever's periodic stays with the Runyans do not constitute a finding of residency. *Amica, supra.*

*Id.* at 191–92. Thus, we rejected the appellant's claims that Clever was a resident of either household, and affirmed the denial of insurance coverage under either policy.[1]

¶ 13 At the other end of the spectrum are cases where extensive habitation was held to constitute residency. *See Krager, supra* (adult son was resident relative under his mother's insurance policy where he lived with her six months of the year, including at the time of the accident, but lived in New York the remaining months, where he voted and was licensed to drive); *In re Residence Hearing, supra* (mother and children who moved to rented townhouse, leaving father in family home, were residents of townhouse where they stayed during day, slept at night, received mail and phone calls, and kept clothing, books, and other supplies).

---

1. Noteworthy, but less helpful because they interpret different terms, are decisions from courts applying Pennsylvania law which reject claims that irregular or infrequent visits constitute "living" in a household. *See Nationwide Mutual Insurance Company v. Budd–Baldwin,* 947 F.2d 1098 (3d Cir.1991) (claimant did not "regularly live" with sister with whom he regularly spent weekends in order to visit his fiancé; he had moved out of her household three years earlier, lived and worked in New Jersey five days a week, kept personal belongings there, spent weekends in New Jersey once every four to six weeks); *St.*

*Paul Fire and Marine Insurance Company v. Lewis,* 935 F.2d 1428 (3d Cir.1991) (insured's son was not "living with" insured for purpose of insurance coverage; son had his own apartment, and although son frequented insured's home to visit, eat meals, and celebrate holidays, his parents maintained a separate room for him there, and his driver's license, bank deposit slips, personal checks, tax returns, and job applications had that home as his address, there was no evidence that the son's visits occurred with any frequency or regularity).

¶ 14 With this caselaw as a guide, we conclude that the trial court did not err or abuse its discretion in finding that A.J. Darr was not a resident of his grandmother's household. The deposition testimony of A.J. Darr, Esther Manross, Chad McClain, Amie Oblinski, Tyler Darr, Justin Zirkle, Corey Blood, Jesse Cornell, Kristin Smith, Shari Cafaro and Anthony Cafaro clearly support the court's determination that A.J. was a drifter whose visits at the Manross home did not occur with any regularity, but rather were random at best. A.J. did not have a key to the Manross home nor did he have a bedroom at the house. When A.J. stayed at the Manross residence he would only stay a couple of nights at any given time, sleeping on the couch or in his brother Tyler Darr's room. At the time of the accident, A.J. had been staying at Chad McClain's house for a period of two weeks to two months and had returned to the Manross home to visit with his brother. While A.J. received some mail at the Manross home over the course of years, kept some personal items there, obtained telephone messages and/or occasionally laundered his clothes there, this course of conduct was for A.J.'s convenience and did not evidence that he physically lived there.

¶ 15 To the extent that the Cafaros argue that the trial court usurped the jury's duty by making credibility determinations regarding the factual circumstances surrounding A.J. Darr's living conditions, we find this claim refuted by the record. Specifically, the Cafaros allege:

> In its Opinion granting Summary Judgment the Trial Court stated "A.J. did stay at the Manross household briefly following his mother's move and then moved to McClain's home, where he stayed for a period of up to two months prior to the incident." The record is far from clear regarding the "move" to Chad McClain's house. In fact, there is testimony from A.J. Darr that the reason that he went to the McClain house was to watch Chad's dog while he was out of town. The record is full of inconsistent statements from witnesses, including those of A.J. Darr himself, regarding his living circumstances. The Trial Court in entering its decision, made credibility decisions regarding the conflicting testimony, which is improper at a Summary Judgment stage. A.J. Darr himself called Esther Manross' house his home. He received mail there, he gave potential employers her address as his residence on employment applications. A.J. Darr had been living this transient lifestyle for years but he always returned to his grandmother's house as he himself considered his grandmother's house his home. Over the years, his grandmother's house is the only home that provided any "stability" to A.J. Darr's transient lifestyle. Clearly this testimony when interpreted in a light favorable to the nonmoving party, raises an issue regarding his residency. Granted there is testimony that conflicts with A.J. Darr's own testimony, however; it is this conflict which should not be decided in a Motion for Summary Judgment. · ·

The Cafaros' Brief at 18 (references to notes of testimony omitted). Although there may have been conflicts in testimony as to the initial reason for staying at the McClain residence or the length of time that A.J. remained there, the deponents' testimony clearly showed, irrespective of the conflicting testimony, that A.J. was not residing at the time of the accident at the Manross home. While it may be true, as the Cafaros suggest, that a person may have more than one residence, this is not such a case. Rather, the testimony revealed that A.J. was a transient who sporadically stayed at various places, includ-

ing his grandmother's (Manross) home, his other grandparents' home, friends' homes and girlfriends' homes. Moreover, A.J.'s statement that he guessed that Grandma Manross' would be where he would call home in June 2004, in itself is not sufficient to establish residency. A.J. Darr Deposition, 2/18/05, at 18. As before mentioned, residency is a question of physical fact and intention or belief is not a relevant consideration. *Amica,* 545 A.2d at 348.

¶ 16 Based on the foregoing, we find that the trial court correctly concluded that there was no genuine issue as to any material fact and that Wall Rose was entitled to judgment as a matter of law due to A.J. not being a resident of the Manross household at the time of the accident. Accordingly, the entry of summary judgment in favor of Wall Rose was not an abuse of discretion.

¶ 17 Judgment affirmed.