**Saul D. WOLFSON, M.D., Petitioner**

v.

**MEDICAL CARE AVAILABILITY AND REDUCTION OF ERROR FUND, Respondent.**

Commonwealth Court of Pennsylvania.

Submitted on Briefs July 8, 2011.

Decided Feb. 7, 2012.

**552**

John S. Bagby, Jr., Paoli, for petitioner.

Cindy E. Sheaffer, Harrisburg, for respondent.

BEFORE: McGINLEY, Judge, and COHN JUBELIRER, Judge, and FRIEDMAN, Senior Judge.

OPINION BY Judge McGINLEY.

Saul D. Wolfson, M.D. (Dr. Wolfson), a psychiatrist and participating health care provider in the MCARE Fund[1], has filed Exceptions to the recommended decision of the Commonwealth of Pennsylvania's Department of Insurance Hearing Examiner (Hearing Examiner) who found that Dr. Wolfson was not eligible for excess coverage under the MCARE Act.

### MCARE Assessments

The MCARE Fund is funded by "assessments" paid by participating health care providers, which are "collected" by the health care provider's primary insurance carrier and remitted to the MCARE Fund. Section 712(d)(1) of the MCARE Act, 40 P.S. § 1303.712(d)(1). The applicable regulations, 31 Pa.Code § 242.6(a)(1)(i) and (a)(3), require that MCARE assessments be received by the MCARE Fund *within 60 days* from the effective date of a health care provider's primary insurance policy. Any health care provider who fails to timely pay the MCARE assessment will not be covered by the MCARE Fund in the event of a loss. 31 Pa.Code § 242.17(b).

The regulations govern when and how the assessments must be remitted to the MCARE Fund. Section 242.6 of the regulations, 31 Pa.Code § 242.6, set forth the primary insurer's responsibilities to: (1)

1. The Medical Care Availability and Reduction of Error Act (MCARE Act), Act of March 20, 2002, P.L., 154, *as amended*, 40 P.S. §§ 1303.101–1303.910, created the MCARE Fund as a statutory insurer providing medical malpractice coverage in excess of the primary layer of coverage purchased by the health care physician or hospital. The MCARE Fund replaced the Health Care Services Malpractice Act, Act of October 15, 1975, P.L. 390, *as amended*, 40 P.S. §§ 1301.101–1006.

collect the MCARE Fund assessment from the health care provider; (2) notify the MCARE Fund, by a Form 5116 or Declarations Page, that the health care provider purchased basic coverage professional liability insurance and paid the MCARE Fund assessment; and (3) submit the MCARE Fund assessment to the MCARE Fund on a "Form 216–Remittance Advice."

Here, Dr. Wolfson's primary professional liability insurance coverage was obtained through an American Psychiatric Association endorsed program, "The Psychiatrists' Program," pursuant to which policies were issued to Dr. Wolfson by National Union Fire Insurance Company of Pittsburgh (National Union). The Psychiatrists' Program is administered by Professional Risk Management Services (PRMS).

National Union issued a basic coverage "claims made" professional liability insurance policy to Dr. Wolfson for the period November 1, 2004, through November 1, 2005. National Union Fire Insurance Company of Pittsburgh Psychiatrists Professional Liability Insurance Policy; Reproduced Record (R.R.) at A27–A41.

On November 5, 2004, Dr. Wolfson submitted an on-line application for an "abatement" of his 2004 MCARE Fund Assessment.[2]

PRMS first billed Dr. Wolfson for his 2004 MCARE Fund Assessment on December 1, 2004. On that date, PRMS sent Dr. Wolfson a Notice entitled "2004 MCARE Fund Surcharge Payment," for 100% of the MCARE surcharge for 2004 in the amount of $3,696.00, to be paid within 10 days of the Notice. The Notice stated that "if you did not apply for the 50% abatement, the full 100% amount is due." Notice, December 1, 2004, at 1; R.R. at A95.

In the meantime, on December 7, 2004, Dr. Wolfson received a medical records request dated December 1, 2004, from Dennis Pomo, Esquire (Attorney Pomo). Attorney Pomo stated that he represented Dr. Wolfson's patient, Joseph Maurer (Mr. Maurer), "now deceased" in a "claim for personal injuries." Letter from Dennis A. Pomo, Esquire, to Saul D. Wolfson, M.D., December 1, 2004, at 1; R.R. at A97. Attorney Pomo requested copies of Mr. Maurer's "medical records, reports, notes, [and] medication lists" for the purposes of "litigation/legal matters." Attorney Pomo enclosed a medical authorization signed by Mr. Maurer's wife, Bernadette Maurer. Authorization for Health Information Disclosure, December 2, 2004, at 1; R.R. at A100.

On December 7, 2004, Dr. Wolfson faxed Attorney Pomo's letter to David J. Torrance, Esquire, Senior Litigation Specialist at PRMS, seeking his assistance. On the fax cover sheet, Dr. Wolfson included the following information: (1) date he first saw Mr. Maurer; (2) date of his final visit; (3) total number of visits; (4) date of birth; (5) date of death; and (6) date of obituary. Fax to David Torrance, Esq., from Saul Wolfson, M.D., December 7, 2004, at 1; R.R. at A99.

Attorney Torrance, in turn, assigned the matter to David Bagby, Esquire, to "assist Dr. Wolfson in his response to the medical records request." Letter to John Bagby,

---

**2.** In order to retain health care providers in Pennsylvania, Act 44, Act of December 23, 2003, P.L. 237, *as amended,* formerly 40 P.S. §§ 1301–A–1310–A, repealed by the Act of December 22, 2005, P.L. 458, 40 P.S. §§ 1303.1101–1303.1115, created the Health Care Provider Retention Program to offer an "abatement" of between 50% and 100% of the MCARE Fund assessment that participating health care providers paid for calendar years 2003 and 2004.

Esq., from David Torrance, Esq., December 8, 2004, at 1; R.R. at A101.

On December 28, 2004, MCARE Fund confirmed Dr. Wolfson's eligibility for a 50% abatement of his 2004 MCARE Fund Assessment.

On January 14, 2005, PRMS sent Dr. Wolfson a revised MCARE Fund Assessment Notice based on his eligibility for the 50% abatement. The payment in the amount of $1,848.00, was due within 10 days of the date of the Notice. MCARE Fund Surcharge Payment Notice, January 14, 2005, at 1, R.R. at A143–A145.

Dr. Wolfson paid his abated 2004 MCARE Fund Assessment to PRMS in full by check in the amount of $1,848.00, dated January 31, 2005.

On March 17, 2005, MCARE Fund received the "Form 216—Remittance Advice" and MCARE assessment payment from PRMS for MCARE Fund coverage for Dr. Wolfson.

The following year, MCARE Fund again determined that Dr. Wolfson was eligible for 50% abatement of his 2005 MCARE Fund assessment.

PRMS sent Dr. Wolfson a revised "2005 MCARE Fund Surcharge Payment" notice dated January 26, 2006, for a total due of $1,213.00. On March 16, 2006, the MCARE Fund received the "Form 216—Remittance Advice" and MCARE Fund assessment payment from PRMS for MCARE Fund coverage for the November 1, 2005, through November 1, 2006, policy period.

On August 30, 2006, a civil action was commenced by Writ of Summons against Dr. Wolfson in the Court of Common Pleas of Bucks County on behalf of Bernadette Maurer, individually and in her right as Administratrix of the Estate of Joseph Maurer, Deceased (hereinafter "Maurer action"). The Writ was served on Dr. Wolfson on September 28, 2006. The Complaint was filed on January 18, 2007, which alleged that Dr. Wolfson failed to adequately treat Mr. Maurer which resulted in his suicide.

On June 21, 2007, the MCARE Fund received a "C–416 Claim Reporting Form" submitted by PRMS, which indicated that the date the claim was first reported to the insured and insurer was "about December 7, 2004" (the date Dr. Wolfson received and then forwarded the request for Joseph Maurer's medical records to PRMS).

On June 22, 2007, MCARE Fund denied Dr. Wolfson MCARE Fund coverage for the claim on the ground that his assessment payment was untimely. MCARE Fund explained that based on the "claim made date of December 7, 2004," the claim was covered by Dr. Wolfson's November 1, 2004–November 1, 2005, National Union policy. The "Form 216–Remittance Advice" and MCARE assessment payment for MCARE coverage for the November 1, 2004–November 1, 2005, coverage period "was required to have been received by the MCARE Fund within sixty-days of the November 1, 2004 National Union policy renewal in order to have been considered timely. They were received on March 17, 2005." Letter to Dr. Wolfson from MCARE Fund, June 22, 2007, at 1; R.R. at A193.

Dr. Wolfson appealed the MCARE Fund's determination and a formal administrative hearing was held on August 12, 2008. Dr. Wolfson testified before the Hearing Examiner that he initially saw Mr. Maurer on January 17, 2002, after he sustained a work-related back injury. Mr. Maurer's Workers' Compensation doctor referred him to Dr. Wolfson for medication management and depression. Hearing Transcript (H.T.), August 12, 2008, at 11;

R.R. at A202. Dr. Wolfson last saw Mr. Maurer on August 31, 2004.

When he received the records request, Dr. Wolfson did not know how Mr. Maurer died and he was not made aware that Mr. Maurer's mental status declined to the point where he had suicidal thoughts. Mr. Maurer told Dr. Wolfson that he would never "think of doing anything like that" because "he was very much involved with his three children." H.T. at 11; R.R. at A202. The last time Dr. Wolfson saw Mr. Maurer, his clinical status was "unchanged and stable." At the time he received the medical records request, Dr. Wolfson knew that Mr. Maurer was involved in legal proceedings related to his pending workers' compensation claim in New Jersey. H.T. at 14–17; R.R. at A203. Dr. Wolfson was unaware that a medical malpractice claim was being brought against him by Mr. Maurer's Estate until he was served with the Writ of Summons on September 28, 2006. H.T. at 19; R.R. at A204.

Dr. Wolfson was not sure how to respond to the records request because it was signed by Mr. Maurer's widow. H.T. at 13–15; R.R. at A202–A203. He faxed the request to PRMS for advice because he was aware that this was one of the services offered by PRMS.[3]

Jason Riley (Mr. Riley), the Division Chief of Policy Administration of the MCARE Fund, explained the MCARE Fund's policies and reasons why it may deny coverage. It is the MCARE Fund's policy to allow coverage so long as it receives a medical provider's Assessment *before* the provider makes or submits a claim to the MCARE Fund for malpractice coverage. H.T. at 34–35; R.R. at A208. The MCARE Fund applies the regulations such that if a claim first becomes known to the MCARE Fund after it is in receipt of the Assessment or surcharge due, the MCARE Fund will allow the provider to "cure the defect" and provide coverage for the claim, provided all other statutory and regulatory requirements are met. H.T. at 36; R.R. at A208. In other words, so long as the MCARE Fund receives the Assessment payment *before* a provider's claim for coverage is submitted then the MCARE Fund will provide coverage, even if it receives the Assessment payment more than 60 days from the effective date of a health care provider's primary insurance policy. However, if an Assessment is received by the MCARE Fund *after* a health provider submits a claim for malpractice coverage, coverage will be denied. H.T. at 37–38; R.R. at A208–A209.

In Dr. Wolfson's case, since the claim was made on December 7, 2004, before the MCARE Fund received Dr. Wolfson's assessment on March 17, 2005, the MCARE Fund would not reconsider or excuse the untimeliness of the assessment payment.

In determining the precise "claim made date" for purposes of coverage eligibility, the MCARE Fund looks to the definition of "a claim" and the criteria for *when* a claim is "first made" relative to when the primary insurance policy is in effect. H.T. at 53–54; R.R. at A212–A213. In Dr. Wolfson's case, the National Union policy was a "claims made" policy which stated: "Notice: This is a claims made policy. Coverage is limited to liability for claims first made against the insured and reported to the company while the coverage is in force." National Union Fire Insurance Company of Pittsburgh Psychiatrists Professional Liability Insurance Policy at 1;

---

3. Dr. Wolfson explained that he previously consulted PRMS on another records request for records of a former patient he saw as a child which included interviews of the parents. He called PRMS to ask whether he was required to release the parent interviews as part of the child's records. H.T. at 29–30; R.R. at A206–A207.

R.R. at A28. The policy defined "a claim" as "a demand received by an Insured [Dr. Wolfson] for money including the service of Suit, demand for arbitration or the institution of any other similar legal proceeding to which this policy applies." National Union Fire Insurance Company of Pittsburgh Psychiatrists Professional Liability Insurance Policy at 1; R.R. at A28. The policy set forth the following with respect to *when* a claim is considered to be "first made":

V. WHEN A CLAIM IS CONSIDERED FIRST MADE

A. A Claim shall be considered as being first made at the earlier of the following times:

1. when the Company first receives notice that a Claim had been made, or

2. when the Insured first gives the Company written notice of specific circumstances involving an incident or injury to a particular person, which may result in a Claim.

National Union Fire Insurance Company of Pittsburgh Psychiatrists Professional Liability Insurance Policy at 10; R.R. at A37.

Based on these policy provisions, the MCARE Fund concluded that the Maurer claim was first made on December 7, 2004, which was the date Dr. Wolfson first received Attorney Pomo's medical records request and forwarded it to PRMS. The MCARE Fund concluded that the information provided by Dr. Wolfson (patient's name, time period during which the patient was seen, total number of visits, codes associated with visits and date of death) constituted "specific information about the incident." H.T. at 59; R.R. at A214. Mr. Riley concluded that because the claim was first made and reported to PRMS on December 7, 2004, and the MCARE Fund received Dr. Wolfson's assessment on March 17, 2005, Dr. Wolfson was not entitled to excess coverage. H.T. at 49; R.R. at A211.

Before the Hearing Examiner, the parties agreed that *if* the Maurer claim was found to have arisen on September 28, 2006, i.e., the date the Writ of Summons was served, and not on December 7, 2004, there *would* be MCARE Fund coverage because Dr. Wolfson's 2005 MCARE Fund assessment was remitted by PRMS before that date. However, the parties disagreed about when the Maurer claim was first made. Dr. Wolfson argued that, contrary to the C–416 Reporting Form, the medical records request was not a claim and that his September 8, 2006, receipt of the Writ of Summons was when the claim was first made. He also contended that even if the claim was made on December 7, 2004, he was entitled to coverage because he paid the assessment promptly after receiving the PRMS invoice for the revised, abated assessment. The MCARE Fund argued, on the other hand, that the December 7, 2004, medical records request constituted a claim under the National Union policy and that Dr. Wolfson was not eligible for coverage because of his late assessment payment.

On March 11, 2011, the Hearing Examiner concluded that Dr. Wolfson was not entitled to excess coverage. The Hearing Examiner interpreted the National Union policy and concluded that the medical records request constituted "a claim." The Hearing Examiner found that under the plain meaning of the National Union policy, the claim was first made in Attorney Pomo's letter to Dr. Wolfson and that Dr. Wolfson reported the claim to his insurer when he sent PRMS the fax dated December 7, 2004. Because the MCARE Fund had not yet received Dr. Wolfson's assessment, Dr. Wolfson was not eligible for MCARE coverage. The Hearing Examiner found:

Although the records request did not make a demand for money, it did inform Dr. Wolfson that his former patient was represented by an attorney bringing a personal injury action. It also informed him that the former patient was deceased and asked for all of Dr. Wolfson's records pertaining to Mr. Maurer. Along with this letter, Dr. Wolfson submitted a note providing additional specific details about the date he saw Mr. Maurer, the treatment codes, and the number of visits. Taken all together, this information gave notice of 'specific circumstances which may result in a claim.' To find otherwise would render this section of the policy meaningless.

Hearing Examiner Recommended Decision, March 11, 2011, at 13–14.

The Hearing Examiner did not address Dr. Wolfson's alternative argument, that even if the Maurer claim was made on December 7, 2004, he was entitled to coverage because he was innocent with respect to the delayed receipt of the assessment by the MCARE Fund.

In his exceptions, Dr. Wolfson raises eight issues, which this Court has condensed into two: (1) whether the Hearing Examiner erred when she concluded that Attorney Pomo's December 7, 2004, medical records request constituted a "claim" and Dr. Wolfson's submission of that request, together with additional information, constituted "reporting of a claim;" and (2) whether the Hearing Examiner erred because she failed to consider that Dr. Wolfson timely paid his assessment but, unbeknownst to him, PRMS did not remit the assessment to the MCARE Fund until March of 2005?

### When was the Claim First Made?

The MCARE Fund will pay a claim if, at the time the claim is first made and reported to the primary insurer, the MCARE Fund excess coverage is in place, *and paid for,* even if the assessment is, in reality, received more than 60 days after the effective date of the primary insurance policy. Consequently, the critical issue is "when" the Maurer claim was "first made."

"When" a claim is "first made" depends on the interpretation of Dr. Wolfson's primary professional liability policy, and an analysis of when a claim arises under the policy language.[4]

 An insurance policy must be interpreted according to the "plain meaning of its terms." *Genaeya Corp. v. Harco Nat'l Ins. Co.,* 991 A.2d 342 (Pa.Super.2010).

> Words of 'common usage' in an insurance policy are to be construed in their natural, plain and ordinary sense, and a court may inform its understanding of these terms by considering their dictionary definitions. Moreover, courts must construe the terms of an insurance policy as written and may not modify the plain meaning of the words under the guise of 'interpreting' the policy. If the terms of the policy are clear, this Court cannot re-write it or give it a construction in conflict with the accepted and plain meaning of the language used.

*Genaeya,* 991 A.2d at 347; quoting *Wall Rose Mutual Ins. Co. v. Manross,* 939 A.2d 958, 962 (Pa.Super.2007), *appeal denied,* 596 Pa. 747, 946 A.2d 688 (2008).

 In this case, the National Union policy provisions, read together, evidence National Union's intent that it would consider a claim made either when (1) it re-

---

**4.** Again, the MCARE Fund, which is not an insurer, looks to the definition of "a claim" and the criteria for *when* a claim is "first made" in whatever primary insurance policy is in effect. H.T. at 53–54; R.R. at A212–A213.

ceived a demand for money, or (2) when it received sufficient notice of circumstances that may result in a claim.

■ The Hearing Examiner found that Dr. Wolfson's fax to PRMS of the medical records request on December 7, 2004, together with the patient's dates of treatment, date of birth, date of death and treatment codes, constituted a "written notice of specific circumstances involving an incident or injury to a particular person, which may result in a claim." This Court must disagree.

First, this Court does not agree that Attorney Pomo's medical records request to Dr. Wolfson constituted a "claim." There is nothing in the correspondence received by Dr. Wolfson from Attorney Pomo which constituted a "demand for money." The stated purpose of the letter was to request Dr. Wolfson's medical records. Attorney Pomo's letter stated that "this office represents your above patient, now deceased, in a claim for personal injuries." However, the letter did not state that Attorney Pomo was asserting a claim for personal injuries *against Dr. Wolfson*. The letter indicated that Mr. Maurer died, but it did not state how he died or that he committed suicide. By all accounts, Mr. Maurer had an ongoing workers' compensation case pending in New Jersey of which Dr. Wolfson was aware. Attorney Pomo's letter contains no details whatsoever which constituted notice to Dr. Wolfson of an impending professional liability claim against him personally.

■ Further, this Court does not agree that Dr. Wolfson "reported a claim" on December 7, 2004, when he faxed Attorney Pomo's medical records request to PRMS. There is nothing in the fax which suggests that Dr. Wolfson intended to report a claim to his insurer when he faxed the information to Attorney Torrance at PRMS. He specifically asked for assistance from PRMS to respond to the medical records request. Attorney Torrance, in turn, assigned the matter to Attorney Bagby to "assist Dr. Wolfson in his response to the medical records request." The fact that Dr. Wolfson included the dates of visits, and date of death, did not constitute "specific circumstances involving an incident or injury to a particular person, which may result in a Claim." Rather it was basic information that disclosed nothing more than the dates he saw Mr. Maurer and the date he died. It was much too vague to constitute the reporting of a professional liability claim.

Attorney Pomo's December 7, 2004, request for medical records, coupled with Dr. Wolfson's request for advice on how to respond to the request, without more, was insufficient to constitute a claim under Dr. Wolfson's National Union policy.

Dr. Wolfson's actual receipt of the Writ of Summons on September 28, 2006, was the earliest date the claim was made under the facts of this controversy. The parties stipulated that if the Maurer claim was first made on September 28, 2006, and not on December 7, 2004, there would be MCARE Fund coverage for the Maurer claim because Dr. Wolfson's 2005 MCARE Fund assessment was remitted by PRMS before that date.[5] Accordingly, Dr. Wolfson is entitled to excess coverage.

---

**5.** Because of this Court's disposition of the first issue, it need not address the second issue which relates to MCARE Fund's policy to deny coverage if a healthcare provider pays his assessment to the primary insurer on time but the insurer remits the assessment to MCARE Fund late. MCARE Fund denies coverage in those situations because it considers the primary carrier as the agent for the healthcare provider. This issue was recently addressed by this Court in as *Highland Park Care Center v. Medical Care Availability and*

Dr. Wolfson's Exceptions to the Hearing Examiner's Proposed Decision are granted.

## ORDER

AND NOW, this 7th day of February, 2012, the Exceptions filed by Petitioner to the Hearing Examiner's Proposed Decision in the above-captioned case are hereby GRANTED. Judgment is entered in favor of Petitioner, Saul D. Wolfson, M.D. MCARE Fund shall provide coverage for the claim at issue.

*Reduction of Error Fund,* 36 A.3d 628 (Pa. Cmwlth.2011), in which this Court held that a healthcare provider who complied with all of MCARE's laws and regulations, must not be penalized for the actions of an approved Insurer which failed to timely remit payments.